ESTATE OF TONY CORDEIRO, DECEASED, MARY CORDEIRO, EXECUTRIX, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

ESTATE OF TONY CORDEIRO, DECEASED, MARY CORDEIRO, EXECUTRIX, AND MARY CORDEIRO, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 3755–66, 3757–66.    Filed October 29, 1968.

*Howard C. Alphson*, for the petitioners.
*James A. Thomas*, for the respondent.

TANNENWALD, *Judge:* Respondent originally determined deficiencies in income tax and by timely amendment to answer increased those deficiencies, as follows:

| Petitioners | Period | Original deficiency | Revised deficiency |
|---|---|---|---|
| Estate of Tony Cordeiro, deceased (docket No. 3755-66) | Sept. 5, through Dec. 31, 1961. | $1,529.84 | $3,678.17 |
| Estate of Tony Cordeiro, deceased, and Mary Cordeiro (docket No. 3757-66). | 1959 | 16,571.54 | 18,197.16 |
| | 1961 | 11,036.29 | 12,571.51 |

The issues remaining for decision (depreciation and loss on sale and death of cows) all turn upon the value of a herd of dairy cows at the time of Tony Cordeiro's death.[1]

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Mary Cordeiro is the surviving spouse of Tony Cordeiro, who died on September 5, 1961, and the sole executrix under his will. Her legal residence at the time of filing the petition herein was Artesia, Calif.

Tony and Mary Cordeiro filed joint income tax returns for the taxable years 1959 and 1961. The Estate of Tony Cordeiro filed returns for the balance of 1961 and 1962. Mary Cordeiro filed a separate return for the year 1962. All of these returns were filed with the district director of internal revenue, Los Angeles, Calif.

Tony and Mary operated a dairy farm in Artesia, Calif., at the time of Tony's death. Mary and Tony's estate continued to operate the farm until the distribution of the estate in 1963. All of the assets on the farm were community property, including 306 Holstein dairy cows. Upon Tony's death, his one-half community interest in the farm, including the 306 dairy cows, passed to his executrix and the other half passed to his wife, Mary, subject to probate administration. The income of the dairy was divided equally between Mary and Tony's estate.

The California milk industry has historically been subject to price-cutting practices because of excess production, which threatened to interfere with the continued supply of milk. This situation prompted the California legislature to enact legislation to alleviate the problem. The dairy industry has been regulated by the Milk Stabilization Act, which controlled all phases of production and delivery, whether sold through routes, stores, supermarkets, cash and carry, dock operations,

---

[1] The two docket numbers herein were consolidated for trial and decision and were consolidated with docket Nos. 3754-66 (Ralph Vander Hoek) and 3756-66 (Henry Struikmans) for trial only. There is a medical deduction item which will be taken care of automatically by our decision herein. Docket No. 3757-66, relating to the taxable year 1959, involves a carryback from the taxable year 1962 which is dependent upon the valuation issue. Protected Milk Producers Association filed a brief as amicus curiae.

or otherwise, and establish a price system to determine the price paid by the creameries and the ultimate consumers.

The Milk Stabilization Act and earlier regulatory legislation contained provisions covering the formation of nonprofit cooperative marketing associations in order to permit dairy farmers to combine for the purpose of selling milk to processing companies. The function of the cooperative is to negotiate contracts with the processing companies for the sale of members' milk.

Protected Milk Producers Association (hereinafter referred to as Protected) is a nonprofit, cooperative marketing association organized under the laws of the State of California in October 1938. Each member of Protected has an assigned production base measured in terms of pounds of butterfat, i.e., 1 pound of base equals 1 pound of butterfat. Historically, allocation of base was made upon the ratio of 1 pound of butterfat for each cow in the member's herd, since each cow produced approximately 1 pound of butterfat per day. As cows and breeding conditions improved, the original allocation formula was no longer reflected in actual butterfat production, since cows could produce more than 1 pound of butterfat per day. The association did not adjust base to reflect these conditions, so that a member needed fewer cows to produce the same amount of butterfat. Tony was allocated 406 pounds of base, although he had only 306 cows at the time of his death.

All members of Protected were obligated to deliver to Protected all milk produced (with the exception of milk retained by the member for domestic purposes). Protected was obligated to accept the milk and use its best efforts to sell the milk and to pay each member his share of the proceeds of sale in proportion to his base. Protected did not guarantee to any member that his milk would be sold, and its contracts to supply milk were subject to cancellation by the processor. Without membership in a marketing association, such as Protected, a milk producer could be assured of an outlet for his milk only through a contract directly with a processor which obligated the producer to sell and deliver and the processor to buy and pay an agreed price for the milk production.

During all relevant periods, changes occurred in the amount of a member's base only when a member sold his herd or a portion of his herd with base, or a member purchased a herd, or a portion of a herd, with base. During this same time, membership in Protected could be obtained only through the purchase from a member of Protected of a herd, or a portion thereof, which had previously been assigned base.

Absent membership in an association (and the concomitant base) or shipping rights deriving from a contract with a processor, it was practically impossible for a milk producer to market milk in California because of an excess of supply over demand. As a result, dairy herds

were customarily sold as a unit only when the purchaser was assured base or other shipping right.

Tony was a member of Protected from June 1951 until his death. During this period all of the milk produced by the Cordeiro herd was marketed through Protected. After his death, all the milk from the herd continued to be marketed through Protected. Mary became a member of Protected and was formally allocated 406 pounds of base in the fall of 1965.

The bylaws of Protected provided, at the time of Tony's death, that "any membership theretofore held, shall ipso facto terminate upon the death of a member" and that—

The Board of Directors will establish reasonable rules and regulations authorizing the acceptance of a transferee and recognizing the purchaser of a member's entire herd, who acquires such member's membership certificate, as a member, and will also determine the conditions under which the executor or administrator of a deceased member may be entitled to continue as a member of the association representing such deceased member, and for the issuance and transfer of an appropriate membership certificate to the successor or successors in interest of such member's herd.

The general pattern in Protected was to recognize a decedent's heirs as successors in interest to the membership and base allocation of the decedent. The heirs could not, however, compel Protected to award them any of the privileges enjoyed by the decedent.

The amount which a purchaser of dairy cows will pay is affected by the following factors:

(a) The age and quality of the cows. The usual mix of a dairy herd involves approximately one-third of an age which makes them separately salable only for "beef"; one-third of an age which makes them separately salable in the "replacement" market for incorporation in another herd as "medium" dairy cows; and one-third of an age which makes them separately salable in such replacement market as "top" cows. At the date of Tony's death, the average sale price of beef Holsteins was approximately $200 per cow; [2] of medium Holsteins $200 to $260 per cow; and of top Holsteins $320 to $350 per cow. The Cordeiro herd reflected this mix and was of less than first-class quality at the time of Tony's death.

(b) The availability of a market for the milk from the cows, if sold as a herd, either through the purchaser's existing membership in a marketing association (and concomitant base) or other shipping rights obtained directly from a processor, i.e., a home for the herd in the purchaser. At the time of Tony's death, herds were acquired by purchasers who already had a "home" at approximately $420 to $435 per cow.

---

[2] As used herein, the term "cow" includes "heifer."

(c) The availability of a home for the herd, through the ability of the purchaser to acquire the membership and/or base or other shipping rights inuring to the seller. At the time of Tony's death, herds were acquired by purchasers, who simultaneously thus acquired a home for the herd, at approximately $725 to $750 per cow.

(d) The fact that a herd is an operating unit distinguished from simply an aggregate of individual cows.

At the time of Tony's death, the 306 Holstein dairy cows were being carried on the books and records of Tony and Mary at a total cost basis of $82,557.85 (or average of $269.80 per head) and a total book value of $56,309.96 (or average of $184.02 per head). The books further indicated that these 306 cows had been purchased during the period 1958 through May 5, 1961, at the following cost and had the following book value as of the date of Tony's death:

| Period acquired | Number of cows | Total cost | Average cost | Total book value | Average book value |
|---|---|---|---|---|---|
| 958 | 85 | $26,940 | $316.95 | $14,470 | $170.23 |
| 959 | 93 | 20,607 | 221.58 | 11,890 | 127.85 |
| 960 | 90 | 24,237 | 269.36 | 20,136 | 223.37 |
| 1/61 to 5/5/61 | 38 | 10,766 | 283.34 | 9,812 | 258.23 |

According to their books and records, on January 1, 1960, Tony and Mary had owned 361 Holstein dairy cows. During the year 1960, Tony and Mary sold 94 cows for a total of $19,111.91 (or average of $203.37 per cow). During the year 1960, 24 cows died, and Tony and Mary claimed total losses of $2,640 (or average of $110 per cow) arising therefrom. These 24 cows had been fully depreciated.

During the period January 1, 1961, to September 5, 1961, Tony and Mary sold 57 cows for a total of $10,287.78 (or average of $180.49 per cow). During this period, 9 cows died, and Tony and Mary claimed total losses of $1,141.75 (or average of $126.86 per cow) arising therefrom.

During the period September 5, 1961, to December 31, 1961, 8 of the 306 dairy cows on hand at the date of Tony's death were culled from the herd and sold for beef for a total selling price of $1,569.84 (or average of $196.23 per head), with a total loss of $3,670.16 reported by the petitioners on this sale (one-half of the total loss reported by each petitioner). During the same period, 5 of the cows died, and a total loss of $3,309 was claimed from the death of these cows.

During the year 1962, 108 of the dairy cows were culled from the herd and sold for beef at a total selling price of $22,228.09. A total loss of $34,231.91 was reported by the petitioners on these sales. During the same year, 16 of the cows died and a total loss of $8,755 was reported by the petitioners.

During 1963, 90 of the dairy cows were culled from the herd and sold for beef and 1 cow died. During 1964, 69 of the dairy cows were culled and sold for beef. None of the remaining cows died.

As of the date of Tony's death, the 306 dairy cows were valued at $700 per cow in the estate tax return and thus given a basis in that amount on the books of the dairy. This figure was used in computing depreciation, gain or loss from sale, and loss upon death for the remainder of 1961 and 1962. Salvage value of $200 per cow and a useful life of 33⅓ months were assigned.

Respondent's deficiency notices were based on a determination of a value of $325 per cow at the time of Tony's death. In his amended answers, respondent asserted increased deficiencies based upon a value of $260 per cow.

### ULTIMATE FINDING OF FACT

The fair market value of the Cordeiro herd at the date of Tony's death was $325 per cow.

### OPINION

The issue here is simple to state: What was the value of the cows in the Cordeiro herd at the date of Tony's death and therefore the basis for computing depreciation and gain or loss by the estate for income tax purposes? Sec. 1014.[3] The answer is more difficult because it involves an evaluation of the elements which should properly be considered in the determination of that value. Petitioners assert that the value of the cows as such and the marketing rights attaching to their production are inextricably intertwined and that the value of the herd should be determined accordingly. Respondent counters with the assertion that the marketing rights attaching to production are separate and distinct and that the value of the herd should be determined on the basis of the price at which the cows could be sold separately.

Initially, petitioners' claim is that, under Protected's bylaws, Tony's membership in Protected automatically terminated with his death and that Tony could not legally transfer his membership or any of the rights which inhered in that membership (including the right to base). The fact that Protected continued to market the Cordeiro milk and did so, in most, if not all, instances when a member died, did not, according to petitioners, transform a discretionary act into an obliga-

---

[3] All references, unless otherwise indicated, are to the Internal Revenue Code of 1954. SEC. 1014. BASIS OF PROPERTY ACQUIRED FROM A DECEDENT.

(a) IN GENERAL.—Except as otherwise provided in this section, the basis of property in the hands of a person acquiring the property from a decedent or to whom the property passed from a decedent shall, if not sold, exchanged, or otherwise disposed of before the decedent's death by such person, be the fair market value of the property at the date of the decedent's death, or, in the case of an election under either section 2032 or section 811(j) of the Internal Revenue Code of 1939 where the decedent died after October 21, 1942, its value at the applicable valuation date prescribed by those sections.

tion on Protected's part, and a corresponding right in Tony's estate or heirs to compel Protected to continue the marketing privilege. Petitioners conclude from the foregoing that none of Tony's rights passed as part of Tony's estate and therefore no value attributable to base was properly includable in his gross estate under section 2033. Petitioners then go on to assert, however, that, based upon expert testimony that a willing purchaser would have paid $750 per cow if the seller's home (i.e., marketing rights) went with the herd, this is the value for estate tax purposes, and therefore the basis for depreciation, of the cows in the hands of Tony's estate or heirs. Petitioners' argument has a "now you see it, now you don't" quality and is, to say the least, somewhat disingenuous.

Tony and Mary owned as community property a herd of 306 dairy cows to which Protected had allocated 406 pounds of base, or 100 pounds of extra base. As we view the evidence, it is clear to us that a willing purchaser would have paid $700 per cow only if he could have arranged to obtain the base allocated by Protected to the Cordeiro herd. In *Ralph Vander Hoek*, 51 T.C. 203, also decided this day, we conclude that both the regular and extra base constitute valuable, nondepreciable, intangible rights separate and apart from the value of a herd. We reach the same conclusion here. Whether realistically, for tax purposes, if not technically as a matter of the law of inheritance, this right passed or did not pass as part of Tony's gross estate is thus beside the point, since under no circumstances could it properly be considered as part of petitioners' basis for depreciation.[4] Viewed in this light, our decision in *Floyd D. Akers*, 6 T.C. 693 (1946), heavily relied upon by petitioners, is clearly distinguishable. That case involved the question of whether intangible rights, in the form of a nontransferable franchise, were distributed in liquidation of a corporation so as to increase the amount of the gain realized by the shareholders. Whatever might have been the bearing of that decision on the question whether the separate right to base would properly have been included in Tony's gross estate for estate tax purposes, it is inapplicable in deciding the value of property that concededly was includable. Indeed, the rationale of *Akers* implies that such intangible rights are separate and distinct from the tangible property to which they relate and, on this basis, actually supports excising the value of the right to base from the value of the Cordeiro herd.

---

[4] The fact that a value of $700 per cow was assigned in the estate tax return is not conclusive against respondent in determining basis. *Helen S. Delone,* 6 T.C. 1188 (1946) ; *Edgar M. Carnrick,* 21 B.T.A. 12 (1930). In this connection, it should be noted that, although such value was apparently accepted on audit of the estate tax return, there is no indication whether this figure was deemed to be a value for each cow per se or simply reflected a lump sum covering the value of the cow and attendant marketing rights, or whether those rights should have been included as part of Tony's gross estate.

We are thus unable to accept the testimony of petitioners' expert witness that the value of the Cordeiro herd was $750 per head, since it is clear to us that this valuation was predicated on the assumption that Tony's right to "base" would become available to a purchaser willing to pay that price. Consequently, a portion of that price must be allocated to the right to base. As our decision in *Ralph Vander Hoek, supra,* reveals, that portion is substantial. Consequently, petitioners' claim to a $700 value, based upon such expert's testimony, must fail.

In this case, the question before us is not what value should be assigned to base but rather what was the fair market value of the Cordeiro herd at Tony's death without regard to base, although obviously the two elements of value are related. Strangely, there appear to be no decided cases dealing with the valuation of a dairy herd for tax purposes. It would appear, however, that the valuation problem presented herein is not unique and can be resolved within the framework of respondent's regulations, which provide that "All relevant facts and elements of value as of the applicable valuation date shall be considered in every case." Sec. 20.2031-1(b), Estate Tax Regs. Our findings of fact delineate the considerations (other than the availability of the seller's base dealt with above) which we deem material:

(1) *The Age and Quality of the Cows.*—Approximately one-third of the Cordeiro herd were of the type salable separately for beef at approximately $200 per cow. One-third were medium Holsteins, i.e., a type of cow salable on the replacement market at $200 to $260 per cow. One-third were top Holsteins, i.e., a type of cow salable on the replacement market at $320 to $350 per cow. The fact is, however, that the Cordeiro herd had defects which have caused us to conclude that it was of less than first-class quality. We have taken this element into consideration in making our ultimate determination of value.

(2) *The Availability of a Market for the Milk From the Cows, if Sold as a Herd, to a Purchaser Who Had His Own Facilities for Marketing the Herd's Milk Production Without Regard to the Acquisition of the Base Allocated to the Herd by Protected.*—The evidence indicates that there was a market for the herd among purchasers who would independently be able to provide the herd with a home. Such purchasers would have been willing to pay $420 to $435 per cow under such circumstances. Nevertheless, the existence of such a market appears to have been limited and we are far from convinced that it offered a ready channel for disposition of the Cordeiro herd.

(3) *The Value of the Cows in Combination as a Herd.*—We think the evidence demonstrates that the sales value of a given number of cows integrated into a herd is greater than the sum of the separate sales value of each cow. This added element of value in a herd is attributable to the mix and reflects the labor and expertise of the owner or his

employees in putting it together and maintaining it. To the purchaser, the ability to obtain a herd in being obviates the necessity of spending several years in its development. The fact is, however, that this "going concern value" is inextricably intertwined with the existence of a home for the herd. If there is no capability for marketing the milk production, it appears to us that there is no distinct element of value to the herd as such and that its value can only be found in the value of the cows considered individually. We thus accord no separate value to this element independent of the existence of a home.

Applying the foregoing factors, we have concluded that, on the record before us, the fair market value of the Cordeiro herd should be fixed at $325 per cow. In so doing, we have had due regard for the location of the burden of proof. Respondent's deficiency notice determined that $325 was the fair market value. We think that petitioners have failed to sustain their burden of proving a greater value. Thus, petitioners' assertion that the evidence has so rebutted the presumption of correctness attaching to respondent's determination that the entire burden of proof should be shifted to him is without merit. In fact, there is ample evidence herein to support our determination. Cf. *Helvering* v. *Taylor*, 293 U.S. 507 (1935) ; see *Jacob D. Farber*, 43 T.C. 407, 428 (1965). On the other hand, respondent's claim of a value of $260 per cow was first asserted in amended answers in order to support the increased deficiencies claimed therein. As to this figure, the burden of proof was upon him. Rule 32, Tax Courts Rules of Practice. It appears to us that respondent has taken too narrow a view in arriving at this figure by limiting himself to the value of each cow sold individually in the replacement and/or beef markets. Consequently, as to this lower figure, we hold that respondent has failed to sustain his burden of proof.

*Decisions will be entered under Rule 50.*