RALPH VANDER HOEK AND ELIZABETH VANDER HOEK, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

HENRY STRUIKMANS AND NELLIE STRUIKMANS, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 3754–66, 3756–66. Filed October 29, 1968.

*Howard C. Alphson*, for the petitioners.

*James A. Thomas*, for the respondent.

TANNENWALD, *Judge:* Respondent determined deficiencies in petitioners' income taxes as follows:

| Petitioners | Docket No. | Year | Deficiency |
|---|---|---|---|
| Ralph and Elizabeth Vander Hoek | 3754-66 | 1963 | $1,162.66 |
| Henry and Nellie Struikmans | 3756-66 | 1962 | 1,232.55 |
| | | 1963 | 6,915.28 |

All matters in issue involve the affairs of the Vander Hoek & Struikmans Dairy, a partnership, in which Ralph Vander Hoek and Henry Struikmans are the sole partners. Petitioners' concessions leave one issue for our consideration, the proper cost basis of a herd of dairy cows purchased by the partnership.[1]

FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Petitioners Ralph and Elizabeth Vander Hoek are husband and wife, as are petitioners Henry and Nellie Struikmans. The Vander Hoek's legal residence at the time of filing the petition herein was Buena Park, Calif.; at that time, the Struikmans had their legal residence in Artesia, Calif. Each couple filed Federal income tax returns for the years in question with the district director of internal revenue, Los Angeles, Calif.

Ralph Vander Hoek and Henry Struikmans were members of a partnership known as Vander Hoek & Struikmans Dairy (hereinafter referred to as the partnership).

In November 1962, through Robert McCune & Associates, the partnership purchased from a Mr. and Mrs. Jensen a herd of 200 Holstein dairy cows, 6 breeding bulls, and certain dairy equipment which the Jensens had simultaneously acquired from one Gerald Swager. This herd is hereinafter referred to as the Swager herd. At that time the partnership was being formed and did not own any dairy cows, bulls, or dairy equipment. By agreement, 20 of the dairy

---

[1] The two docket numbers were consolidated for trial and decision and were consolidated with docket Nos. 3755-66 (Estate of Tony Cordeiro, deceased) and 3757-66 (Estate of Tony Cordeiro, deceased, and Mary Cordeiro) for trial only. There is a medical deduction item which will be taken care of automatically by our decision herein. Protected Milk Producers filed a brief as amicus curiae.

cows were allocated to Struikmans individually for another partnership, known as Struikmans & Son, which is not in any way involved herein. The total purchase price was $164,665, of which $18,700 was paid by Struikmans on behalf of Struikmans & Son Dairy and the remainder, $145,965, was paid by the Vander Hoek & Struikmans Dairy.

The California milk industry has historically been subject to price-cutting practices because of excess production which threatened to interfere with the continued supply of milk. This situation prompted the California legislature to enact legislation to alleviate the problem. The dairy industry has been regulated by the Milk Stabilization Act, which controlled all phases of production and delivery, whether sold through routes, stores, supermarkets, cash and carry, dock operations, or otherwise, and established a price system to determine the price paid by the creameries and the ultimate consumer.

The Milk Stabilization Act and earlier regulatory legislation contained provisions covering the formation of nonprofit cooperative marketing associations in order to permit dairy farmers to combine for the purpose of selling milk to processing companies. The function of the cooperative is to negotiate contracts with the processing companies for the sale and distribution of members' milk.

Protected Milk Producers Association (hereinafter Protected) is a nonprofit, cooperative marketing association organized under the laws of the State of California in October 1938. Each member of Protected has an assigned production "base," measured in terms of pounds of butterfat, i.e., 1 pound of base equals 1 pound of butterfat. Historically, allocation of base was made upon the ratio of 1 pound of butterfat for each cow in the member's herd, since each cow produced approximately 1 pound of butterfat per day. As cows and breeding conditions improved, the original allocation formula was no longer reflected in actual butterfat production, since cows could produce more than 1 pound of butterfat per day. The association did not adjust base to reflect these conditions, so that a member needed fewer cows to produce the same amount of butterfat. Swager was allocated 233.7 pounds of base for the 200 cows sold to petitioners herein.

All members of Protected were obligated to deliver to Protected all milk produced (with the exception of milk retained by the member for domestic purposes). Protected was obligated to accept the milk and use its best efforts to sell the milk and to pay each member his share of the proceeds of sale in proportion to his base. Protected did not guarantee to any member that his milk would be sold, and its contracts to supply milk were subject to cancellation by the processor. Without membership in a marketing association, such as Protected, a milk producer could be assured of an outlet for his milk only through

a contract directly with a processor which obligated the producer to sell and deliver and the processor to buy and pay an agreed price for the milk production.

During all relevant periods, changes occurred in the amount of a member's base only when a member sold his herd or a portion of his herd with base, or a member purchased a herd, or a portion of a herd, with base. During this same time, membership in Protected could be obtained only through the purchase from a member of Protected of a herd or a portion thereof which had previously been assigned base.

Absent membership in an association (and the concomitant base) or shipping rights deriving from a contract with a processor, it was practically impossible for a milk producer to market milk in California because of an excess of supply over demand. As a result, dairy herds were customarily sold as a unit only when the purchaser was assured the concomitant base or other shipping right.

Membership in Protected was always nontransferable, but prior to February of 1959 a member could sell any or all of his dairy herd with concomitant base to another member without submitting the sale to Protected's board of directors for review. In February 1959, because Protected believed herds were bringing an inflated value attributable to base, Protected placed a moratorium upon all sales with base except in cases of hardship. On August 19, 1959, a new policy was established with respect to the sale of dairy herds with base. This policy was followed by Protected from the date of its adoption through all periods relevant to this case. The relevant portions of the resolution adopting the new policy provided:

(1) Any member desiring to sell any or all of his dairy herd with shipping base shall immediately notify the Board of Directors in writing of said desire. Said notification shall set forth all of the terms, conditions and proposed price of said sale and the name of the proposed buyer, if selected. As a part of said notification the member shall request cancellation of his shipping base to the extent proposed to be sold; said cancellation to become effective upon the completion of said transaction.

(2) At such time or times as the Board of Directors shall designate, the seller and proposed purchaser shall make all records and information requested by the Board of Directors available and shall execute an agreement and warranty in the form as prescribed by the Board of Directors setting forth all the true facts concerning the price to be paid therefore, the terms of the financing, terms of loan, if any, and all other information and data requested by the Board of Directors. The duty to furnish this shall be upon the seller and proposed buyer.

(3) The Board of Directors shall then determine within a reasonable time whether or not the price, terms and all other conditions and circumstances existing are economically sound and whether or not they reflect an inflated value therefore in any way attributable to a membership interest in the association. The Board of Directors shall not approve a sale where the price placed thereon

or the terms of the entire transaction are such that it reflects a value therefore which is inflated so that it is not comparable with the market value of comparable cows under the same terms and conditions without an inflated value attributable to an interest in the association. The determination of the Board of Directors shall be conclusive and binding upon all members.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(6) Upon the selection of a buyer the completion of the sale shall be subject to the satisfaction of the association that the terms and conditions approved by the association are being complied with.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(8) Prior to completion of the sale, the buyer shall enter into a written agreement with the association in such form as is prescribed by the association, providing for the immediate termination and cancellation of buyer's membership and right to ship milk to the association, and for liquidated damages to the association in the event of the falcity [sic] or untruthfulness of any of the representations made by the seller or the buyer in the transaction, or in the event of a violation by the buyer of the terms of the Articles of Incorporation or By-Laws or rules and regulations of the association.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(13) Not more than 1.5 pounds, nor less than 1.0 pounds, of butterfat daily per cow sold shall be approved by the Board of Directors for issue to the buyer as shipping base.

(14) In the event all of the rules and regulations of the Board of Directors and the provisions of the Articles of Incorporation and By-Laws of the Association, have been complied with by the buyer and seller, and the necessary agreements have been entered into by the buyer and seller and the Board of Directors approves the sale, and the buyer then the Board of Directors shall cancel seller's shipping base as requested, and upon buyer becoming a member of the association shall issue to said buyer a shipping base with the association in such amount as the Board of Directors has determined to be proper under the circumstances; notification of the amount thereof to be given to the buyer and seller at such time as the Board of Directors approves the buyer.

The customary procedure followed by Protected in approving the sale of all or part of a member's herd with base after the August 19, 1959, resolution was as follows: A member desiring to sell part or all of his herd with base would notify Protected of his intention. If a purchaser had been found, Protected's manager would schedule a conference between the parties where the terms and conditions would be reduced to writing. The items included in the sale would be appraised, and the terms and conditions would then be submitted to the Protected board for approval. If the board of directors approved the sale, Protected would cancel the base the seller was relinquishing and issue a like amount to the buyer. If the proposed purchaser was not a member of Protected, he had to execute a membership application and formally become a member of Protected prior to the issuance of any base. In evaluating a proposed application, the board took into consideration the age and physical condition of the herd, the butterfat production of the herd, the amount and nature of milking equipment, the prices at

which cows were being sold in the replacement market, and the milk marketing conditions at the time.

Protected required the seller and buyer to execute certain documents in conjunction with a sale transaction, including a "Request for Cancellation of Shipping Base and for Issue Thereof" which provided in pertinent part:

The undersigned Seller does hereby declare that it is his desire to sell ————————head, * * *, and to have————————pounds, or all, of his shipping base cancelled and issued by the Association to the proposed Buyer.

Protected also required an "Agreement and Warranty of Facts" form which stated that the terms of sale as set forth were to induce Protected to cancel an appropriate amount of the seller's base and issue the same to the buyer.

The proposed sale of the Swager herd with base and equipment was presented to Protected in November 1962 and was processed by Protected in accordance with the foregoing procedure. To determine the economic soundness of the transaction, the Protected manager and board broke down the asking price as follows: $740 for each cow, pound of base, and equipment, which equaled $148,000 for 200 cows; $450 per pound of base for 33.7 pounds of base in excess of the number of cows (i.e., extra base), which equaled $15,165; and $250 each for 6 bulls, which equaled $1,500. The maximum amount which Protected allocated to a pound of base at this time was $450. Protected approved the proposed sale at its board meeting on November 21, 1962, and canceled the Swager base and issued a like amount of base to the partnership on December 19, 1962, effective as of December 1. Thirty pounds of base were allocated to the 20 cows transferred to Struikmans (which are not involved herein).

The amount which a purchaser of dairy cows will pay is affected by the following factors:

(a) The age and quality of the cows. The usual mix of a dairy herd involves approximately one-third of an age which makes them separately salable only for "beef"; one-third of an age which makes them separately salable in the "replacement" market for incorporation in another herd as "medium" dairy cows; and one-third of an age which makes them separately salable in such replacement market as "top" cows. In November 1962, the average sale price of beef Holsteins was approximately $200 per cow;[2] of medium Holsteins $200 to $270 per cow; and of top Holsteins $300 to $360 per cow. At the time of the sale to petitioners, the Swager herd reflected this mix and was of excellent quality.

(b) The availability of a market for the milk from the cows, if sold as a herd, either through the purchaser's existing membership

---

[2] As used herein, the term "cow" includes "heifer."

in a marketing association (and concomitant base) or other shipping rights obtained directly from a processor, i.e., a "home" for the herd in the purchaser. In November 1962, herds were acquired by purchasers who already had a home at approximately $425 to $450 per cow.

(c) The availability of a home for the herd through the ability of the purchaser to acquire the membership and/or the base, or other shipping rights inuring to the seller. In November 1962, herds were acquired by purchasers, who simultaneously thus acquired a home for the herd, at approximately $750 per cow.

(d) The fact that a herd is an operating unit as distinguished from simply an aggregate of individual cows.

In December 1962, the partnership sold 6 of the dairy cows and 1 of the breeding bulls from the Swager herd for a net selling price of $1,290.05 and claimed a loss of $3,347.48. During 1963, the partnership sold 46 dairy cows and 5 breeding bulls from the Swager herd for a total net selling price of $9,629.46 and claimed a loss of $22,392.70.

Fifty-four of the cows in the Swager herd had been purchased in 1960, 76 of the cows had been purchased in 1961, and 76 had been purchased in 1962. Of the cows purchased in 1962, Swager paid approximately $300 each for 57, and approximately $345 each for 19. The last 44 were purchased by Swager at approximately $300 per head.

On March 31, 1963, the partnership purchased 15 replacement dairy cows for a total purchase price of $3,610 (or an average of $240.66 per head). On November 19, 1963, the partnership purchased 12 replacement dairy cows for a total purchase price of $3,212.50 (or an average price of $267.70 per head).

During the year 1964, the partnership sold 49 of the Swager cows for a total of $8,621.22 (average of $175 per cow, and claimed a loss of $11,621.80. During 1965, the partnership sold 58 of the Swager dairy cows for a total of $9,889.05 (average of $170 per cow) and claimed a total loss of $5,376.72.

The purchase price paid by the partnership for the Swager herd (exclusive of the 20 cows assigned to Struikmans) was allocated as follows: [3]

| Assets | Each | Total |
|---|---|---|
| 180 dairy cows | $769. 25 | $138, 465 |
| 6 breeding bulls | 250. 00 | 1, 500 |
| Dairy equipment | | 6, 000 |
| | | 145, 965 |

[3] No question is involved herein with respect to the amount allocated to the bulls or the dairy equipment.

The partnership computed depreciation using a cost basis of $769.25 per cow, a salvage value of $200 per cow, and a useful life of 33⅓ months. Respondent has determined that the cost basis of the 180 dairy cows was $260.25 per cow.

ULTIMATE FINDING OF FACT

The partnership's unadjusted cost basis per cow in the Swager herd was $375.

OPINION

Unlike the situation in *Estate of Tony Cordeiro*, 51 T.C. 195, also decided this day, we are not faced with the problem of constructing a cost basis for the Swager herd based upon a hypothetical fair market value on a given date. In this case, we know that the partnership paid $138,465 for 180 cows, or $769.25 per cow, and the question to be decided is whether all of that amount should be deemed the cost basis of the cows for purposes of depreciation or whether only a part thereof should be allocated to such basis, with the balance being allocated to the marketing privilege which petitioners obtained in respect of the herd and, in the latter case, whether the amount allocated to such privilege is nondepreciable. Petitioners contend for the former position. Respondent asserts that the latter view should be adopted. We hold for respondent, although we have adjusted upward his determination of the amount to be allocated to the cost basis of the cows.

Essentially, petitioners' position is that, under Protected's bylaws and policies, in effect in November 1962, Swager could not legally transfer the right to base allocable to the 180 cows involved herein, that the sole source of such right which petitioners acquired could only be and was Protected, and that, therefore, the entire amount paid for the cows should be treated as allocable to their cost basis. We disagree.

Although petitioners did not testify and we therefore have no direct evidence as to their motivation at the time of the transaction involved herein, we are satisfied on the record before us that they would not have paid $769.25 per cow unless they obtained the right to base inuring to the Swager herd. All of the facts and circumstances herein support this conclusion. On the day of the agreement of sale, petitioners executed a membership application in Protected and the sale agreement was approved on November 21. On December 19, 1962, petitioners' membership in Protected and the allocation to petitioners of the right to base attaching to the Swager herd was approved by Protected's board of directors. Although there is no direct evidence thereof, we are satisfied that both the partnership and Swager executed Protected's form of an "Agreement and Warranty of Facts" and that

Swager executed Protected's form of "Request for Cancellation of Shipping Base and for Issue Thereof" for the benefit of petitioners. The underlying calculations, upon which Protected determined the economic soundness of the sale and petitioners' accountant determined the allocation of consideration between Struikmans & Son and the partnership with respect to the 20 cows, show on their face an allocation of $450 per pound of base.[4] Although the escrow agreement covering the sale did not expressly refer to petitioners' obtaining membership in Protected or being assigned the base attributable to the Swager herd, we are satisfied that, in point of fact, the sale would not have closed unless the membership and right to base had been acquired.

It is true that technically Swager's membership was canceled and his right to base was released to Protected and then reissued by Protected to petitioners. But it is clear that petitioners would not have obtained the membership and the concomitant right to base unless Swager had thus transferred them. In a very real sense, therefore, Swager was the source of the membership and the right to base and petitioners bargained for and obtained them from him. Cf. *Samuel D. Miller*, 48 T.C. 649, 653 (1967). To view the transaction as petitioners claim we should, would be to exalt the "regularity of form" over "plutological reality." See *Burde* v. *Commissioner*, 352 F. 2d 995, 1001 (C.A. 2, 1965). We hold that a portion of the purchase price paid by petitioners should be allocated to the right to base, whether regular or extra. Cf. *Wood County Telephone Co.*, 51 T.C. 72 (1968); *Thompson* v. *Commissioner*, 205 F. 2d 73 (C.A. 3, 1953); *John W. Walter, Inc.*, 23 T.C. 550 (1954); *Pasadena City Lines, Inc.*, 23 T.C. 34 (1954). We think that *Floyd D. Akers*, 6 T.C. 693 (1946), is distinguishable for the reasons set forth in *Estate of Tony Cordeiro, supra*. In addition, in *Akers*, the generating source of the franchise was the same individuals who continued the franchised operation after liquidation of the corporation; to have held that they should recognize a gain on an asset which in effect already belonged to them would have accorded primacy to theoretical form over practical substance, which is precisely what we refuse to do herein. Nor do we consider opposite petitioners' analogy of a purchaser of real property, who thinks he can upgrade the property through a zoning change, and therefore is willing to pay an increased price. In such a situation, the purchaser is not in any way dependent upon the seller for the success of any such effort. The zoning authorities are the *sole* source of his ability to obtain a change.

---

[4] While these calculations show $450 per pound of "extra base," i.e., the 33.7 pounds, there is nothing in the record to indicate any differentiation between extra base and the 1-pound-per-cow regular base.

Having determined that petitioners paid $769.25 partly for each cow and partly for the right to base, we must now determine how much should be allocated to each. Respondent insists that only $260.25 should be included in the cost basis of the cow and the balance, or $519, should be attributed to the right to base. We are convinced that a different allocation should be made. In all the calculations relating to the transaction, only $450 was assigned per pound of base. Thus, we think this is the outside limit which should thus be allocated. However, this figure represents only a *maximum*. Protected was only interested in determining whether an inflated price was being paid so as to avoid payment of a higher price than would allow a fair return on investment. To make this determination, it used $450 as a rule of thumb. We see no reason to adopt this figure as the actual value of the right to base and obtain the cost of the cows simply by subtracting that figure from the $769.25 per cow paid.

As we view the problem, the basic question is what would a willing purchaser have paid for the Swager herd without regard to his obtaining the right to base that inured to the herd. Our findings of fact set forth the elements and underlying facts which we think must be taken into account in answering that question. We have indicated in our opinion in *Estate of Tony Cordeiro, supra,* how those elements and facts should be applied and we see no need to repeat what we said there, except to note that, unlike the *Cordeiro* herd, the Swager herd was of excellent quality and we are dealing herein with the situation in November 1962 rather than on September 5, 1961.

On the foregoing basis, we have concluded, as our findings of fact show, that $375 per cow should be allocated to the cost of the cows. The balance of the purchase price, namely $394.25, should be allocated to the right to base. Since this is an intangible asset without an ascertainable useful life, it is nondepreciable. Cf. *Wood County Telephone Co., supra; Nachman v. Commissioner,* 191 F. 2d 934 (C.A. 5, 1951), affirming 12 T.C. 1204 (1949) ; *Kimble v. Stuart,* an unreported case (D. Ariz. 1955, 48 A.F.T.R. 1919, 55–2 U.S.T.C. par. 9764) ; *V. P. Shufflebarger,* 24 T.C. 980 (1955) ; see sec. 1.167(a)–3, Income Tax Regs; Rev. Rul. 65–228, 1965–2 C.B. 43.

One final note. Petitioners make the same argument as to the burden of proof as was made in *Estate of Tony Cordeiro, supra.* We dispose of it on the same basis except that in this case we do not have the additional problem of the burden of proof with respect to any claim for increased deficiencies by respondent.

*Decisions will be entered under Rule 50.*