GERRIT VAN DE STEEG AND EILEEN G. VAN DE STEEG, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 4934–71, 4470–72.   Filed April 2, 1973.

*Thomas H. Macbride, James L. Magee,* and *Donald K. Franklin,* for the petitioners.

*Richard J. Shipley,* for the respondent.

DAWSON, *Judge:* In these consolidated cases the respondent determined deficiencies in petitioners' Federal income taxes, as follows:

| Taxable year | Deficiency |
|---|---|
| 1967 | $321. 24 |
| 1968 | 1, 922. 93 |
| 1969 | 3, 778. 09 |
| 1970 | 2, 968. 68 |

Some adjustments made by the respondent in his notices of deficiencies are not contested by petitioners. At issue is whether the class I milk base purchased by petitioners during the years 1967 through 1970 is a depreciable intangible asset under section 167, I.R.C. 1954, and section 1.167(a)–3, Income Tax Regs. More specifically, the answer turns upon whether the purchased class I milk base had a determinable useful life measured by the termination date stated in the statute in force at the time the petitioners were required to file (and did file) their Federal income tax returns.

### FINDINGS OF FACT

Some of the facts are stipulated and are so found.

Gerrit and Eileen Van De Steeg (herein called petitioners) are husband and wife whose legal residence was Auburn, Wash., when they filed their petitions in these proceedings. They filed timely Federal income tax returns for the years 1967 through 1970 with the Service Center for the Seattle District of the Internal Revenue Service.

During the years 1967 through 1970 the petitioners were engaged in the dairy-farming business and they marketed the milk which they produced in the Puget Sound, Wash., milk-marketing area. The marketing of milk in the Puget Sound area is regulated by Federal Milk Marketing Order No. 125 (7 C.F.R., Part 1125).

The Puget Sound Milk Marketing Order was issued and is administered by the U.S. Secretary of Agriculture pursuant to an enabling statute of the United States. This enabling statute is known as the "Agricultural Marketing Agreement Act of 1937," ch. 296, 50 Stat. 246, 7 U.S.C. sec. 601 *et seq.,* as amended. The portions particularly applicable to the marketing of milk are sections 608(c)(5) and (18).

The enabling statute authorizes milk-marketing orders to contain provisions which (1) classify milk of equal grade and quality on the basis of whether it is used for fluid consumption or manufacture; (2) establish different minimum prices to be paid to producers for milk of identical grade and quality when used in the different uses; and (3) effectuate an adjustment whereby the total value of all milk purchased will be equitably apportioned among producers on the basis of their marketings of milk.

The Puget Sound Federal Milk Marketing Order, in compliance with the enabling statute, among other things, fixes minimum prices which handlers are required to pay to producers for grade A milk marketed by them in the Puget Sound milk-marketing area. These prices are at different levels depending upon the use which is made of the milk.

Class I uses include fluid consumption of milk and related uses. Class II and III uses of milk include manufacturing and related uses. The class I price is approximately $2 per cwt. higher than the class III price.

The Puget Sound Federal Milk Marketing Order contains a "base plan" the provisions of which equitably apportion among producers the total value of milk marketed under the order on the basis of their respective marketing of milk. Under the "base plan" each producer's share of the market's class I sales (and of the class I price derived therefrom) is measured by his milk base, commonly referred to as "base." A "base" is a "bundle of rights," primarily the right to receive a premium price for a fixed quantity of milk. Each producer's "base" is stated in terms of pounds of milk per day.

The Puget Sound Federal Milk Marketing Order also provides that any milk marketed by any producer in excess of his "base" is "excess milk." It further provides that the minimum price to be paid to a producer for his "excess" deliveries to the Puget Sound Federal milk-marketing area shall be at approximately the class III price.

The order also provides that the minimum price to be paid to a producer for his deliveries of milk within his base will be at the class I price, unless class I sales are less than the total base which has been apportioned, in which event the producer will receive a "blend" of the class I price received for class I sales and the class II or III price received for any base milk not utilized in class I sales.

From 1951, when the first milk-marketing order was issued for the Puget Sound area, up until September 1967, the Puget Sound Milk Marketing Order provided for a "base plan" in order to apportion among producers the total value of milk marketed under the order and

these bases were earned annually by producers. The producer "bases" were measured by each producer's production history during the base-making months for the year. Milk base as a separate asset was not purchasable under the Puget Sound Federal Milk Marketing Order prior to September 1967; it was transferable only together with a dairy herd.

The milk base earned and/or purchased under this base plan expired at the end of the year the base was earned and/or acquired with a herd.

In 1965 Congress enacted the Food and Agricultural Act of 1965, Pub. L. 89–321, 79 Stat. 1187. Title I of Pub. L. 89–321 amended the milk-marketing sections of the Agricultural Act of 1937 as amended.

Effective September 1, 1967, and after completion of compliance with statutory procedural requirements, the Puget Sound Federal Milk Marketing Order was amended so as to incorporate class I base provisions into the base plan sections of the order thereby creating a new base plan, commonly referred to as the "class I base plan."

The 1967 amendment to the Puget Sound Federal Milk Marketing Order directed the administrator of the order to allocate to each eligible producer a new base, referred to as a "class I milk base," which was to be measured by his production in certain defined years preceding the effective date of the amendment.

The 1967 amendment also provided that the class I milk base so allocated was fixed in amount during the term of the base plan and a producer could increase the amount of class I milk base held by him only by purchasing additional class I milk base from another producer.

The 1967 amendment also provided that the class I milk base so allocated could be transferred from one person to another, independently from transfer of the cows, the herd, or farm (in which the milk base was considered to "inhere" under the prior base plan).

By purchasing additional quantities of class I milk base, a producer could increase the quantity of milk marketed by him which was paid for at the premium class I price.

On separate occasions during the years 1967, 1968, 1969, and 1970 petitioners purchased an intangible asset commonly referred to as a "class I milk base." The details of such purchases are set forth in the following schedule:

| Date | Pounds of base purchased | Cost |
| --- | --- | --- |
| 10/67 | 1, 183 | $11, 707. 50 |
| 2/68 | 499 | 6, 237. 50 |
| 8/68 | 341 | 3, 239. 50 |
| 2/69 | 240 | 3, 120. 00 |
| 9/69 | 286 | 2, 860. 00 |
| 9/70 | 1, 000 | 7, 700. 00 |

The class I milk base purchased by the petitioners was an intangible asset used in their business of dairy farming.

In their Federal income tax returns the petitioners claimed deductions as depreciation upon class I milk bases purchased by them as follows:

| Taxable year | Milk base depreciation claimed |
| --- | --- |
| 1967 | $1, 350. 84 |
| 1968 | 9, 339. 20 |
| 1969 | 12, 701. 61 |
| 1970 | 5, 697. 85 |

Respondent disallowed petitioners' deduction for depreciation for class I milk base for 1967 on the ground as stated in the notice of deficiency dated April 12, 1971, that "no determinable life is ascertainable for such milk base so as to support any depreciation or amortization deduction for the milk base." Respondent disallowed the depreciation deductions claimed by petitioners for 1968, 1969, and 1970 on the ground as stated in the notice of deficiency dated March 31, 1972, that "the cost of such milk base is not depreciable nor amortizable because it could not be established at the time of purchase that it had a determinable useful life."

Section 103, tit. I, Pub. L. 89–321, as enacted by the Congress, provided as follows: "Sec. 103. The provisions of this title shall not be effective after December 31, 1969."

Class I milk base purchased pursuant to the 1967 amendment to the Puget Sound Federal Milk Marketing Order was to expire on December 31, 1969, pursuant to section 103, tit. I, Pub. L. 89–321, and the provisions of the amendment.

Following adoption of the class I milk base provisions on September 1, 1967, the Puget Sound milk producers made strenuous efforts to persuade Congress to perpetuate the enabling legislation which created the class I bases. Although Congress refused to make the class I milk base enabling legislation permanent, as requested by the Secretary of Agriculture, it enacted on October 11, 1968, a new statute (Pub. L. 90–559), which extended the life of the old statute for 1 year. Among other things it changed section 103 of tit. I, Pub. L. 89–321, to read as follows: "Sec. 103. The provisions of this title shall not be effective after December 31, 1970." The Secretary of Agriculture correspondingly amended the Puget Sound Federal Milk Marketing Order so that the class I base provisions thereof would expire December 31, 1970, instead of December 31, 1969.

On November 30, 1970, Congress enacted the Agricultural Act of 1970, Pub. L. 91–524, 84 Stat. 1358, which authorized a different set

of provisions to be placed in the base plan sections of the order. Section 201(c) of the 1970 statute provides as follows:

(c) nothing in subsection (a) of this section 201 shall be construed as invalidating any class I base plan provisions of any marketing order previously issued by the Secretary of Agriculture pursuant to authority contained in the Food and Agricultural Act of 1965 (79 Stat. 1187), but such provisions are expressly ratified, legalized, and confirmed and may be extended through and including December 31, 1971.

On December 24, 1970, the Secretary of Agriculture issued an order amendment canceling the terminal date of December 31, 1970, which was provided in the order for the base provisions.

In accordance with the 1970 statute and after compliance with the statutory procedural requirements, the Secretary of Agriculture amended base plan provisions of the order effective July 1, 1971. All class I milk base purchased pursuant to the marketing order which was adopted under Pub. L. 89–321 and the 1967 amendment ceased to exist as of June 30, 1971.

No portion of the purchased class I milk base was carried over into the base plan authorized by the Agricultural Act of 1970 and implemented by the order amendment dated June 15, 1971.

Milk base allocated to producers pursuant to the order amendment dated June 15, 1971, was not substituted or exchanged for the class I milk base purchased pursuant to the 1967 amendment.

OPINION

The parties point out that this is a case of first impression. No court has previously considered the issue of depreciation of *purchased* class I milk base. In the *Estate of Tony Cordeiro*, 51 T.C. 195 (1968), and *Ralph Vander Hoek*, 51 T.C. 203 (1968), where this Court held that an intangible asset referred to as "milk base" was nondepreciable, there was involved a "permanent" production quota assigned by a marketing cooperative. Nothing in those opinions indicates the existence of any stated expiration date and, consequently, they are distinguishable.[1] Nor is the case of *V. P. Shufflebarger*, 24 T.C. 980 (1955), applicable here. In that case the taxpayer attempted to depreciate the purchase price of a "grazing preference" the ownership of which enabled him to obtain a "grazing permit" issued by the U.S. Forest Service. We found that a "grazing preference" had no time limitation; that "grazing permits" were customarily renewed by the Forest Service; and that it would be against the policy of the enabling legislation not to permit such a renewal practice. Accordingly, we held that the pur-

---

[1] We note that the instant case is similar to Rev. Rul. 70–644, 1970–2 C.B. 167, the validity of which is involved herein.

chased grazing preference and accompanying rights were not subject to depreciation. The facts of that case are clearly different from the facts of this case.

Section 167, I.R.C. 1954,[2] and section 1.167(a)–3, Income Tax Regs.,[3] which are set forth in the margin below, are applicable in this case.

Petitioners make the following arguments:

(1) The class I milk base purchased by them was an intangible, income-producing asset.

(2) The class I milk base purchased by them was quota-like in its nature inasmuch as a fixed amount of such base was determined and allotted as of September 1, 1967, and no new base was created (or permitted) throughout the effective period of the 1967 amendment of the Puget Sound Milk Order.

(3) The class I milk base purchased by them was unique and different in nature and character from milk bases created by the provisions of the Puget Sound Milk Order in force both before and after the period the 1967 amendment was in force in that the provisions establishing the "quota-like" fixed quantities of base were absent from the order provisions in force both before and after the effective date of the 1967 amendment.

(4) The class I milk base purchased by them had a determinable useful life inasmuch as the Act of Congress which authorized the existence of such class I milk base and the U.S. Department of Agriculture milk-marketing order promulgated pursuant thereto which actually created such class I milk base contained a specific terminus date after which the class I milk base would cease to exist.

(5) The class I milk base purchased by them did in fact cease to exist on June 30, 1971.

(6) In computing their Federal income taxes for the years 1967, 1968, 1969, and 1970, they were entitled to rely upon the statutes and regulations of the United States in effect at the time their respective tax returns for those years were filed.

---

[2] SEC. 167. DEPRECIATION.

(a) GENERAL RULE.—There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—

(1) of property used in the trade or business, or

(2) of property held for the production of income.

[3] Sec. 1.167(a)–3 Intangibles.

If an intangible asset is known from experience or other factors to be of use in the business or in the production of income for only a limited period, the length of which can be estimated with reasonable accuracy, such an intangible asset may be the subject of a depreciation allowance. Examples are patents and copyrights. An intangible asset, the useful life of which is not limited, is not subject to the allowance for depreciation. No allowance will be permitted merely because, in the unsupported opinion of the taxpayer, the intangible asset has a limited useful life. No deduction for depreciation is allowable with respect to goodwill. * * *

(7) It is against public policy for the Internal Revenue Service to require them in computing their Federal income taxes (a) to disregard the statutes and regulations of the United States in effect at the time their respective tax returns at issue herein were filed; and (b) to foresee or anticipate that Congress might amend existing statutes and regulations or enact new statutes and regulations which would have the effect of extending the life of the class I milk base purchased by them.

Respondent counters with the contention that the useful life of petitioners' purchased class I milk base was not limited but rather was indeterminate, and therefore is not subject to depreciation. He argues that the length of time the base would continue to be useful was not fixed by the formal expiration date of the underlying statute but would be determined by the policy of Congress with respect to the farm economy generally.

We agree with the petitioners for reasons subsequently stated herein.

The class I milk base purchased by petitioners was an income-producing asset because the order itself, in sections 1125.70, 1125.71, and 1125.72, provides that the uniform price paid to producers shall be a "blend" of the class I price for ⅚ of base milk and the class III price for ⅙ of the base milk, whereas the uniform price to be paid to producers for milk in excess of base is simply the class III price. Since the class I price ranged from $5.90 to $6.68 from September of 1967 through June of 1971, and the class III price ranged from $3.93 to $4.77 during the same period, it is clear that the order, by its own terms, made the ownership of base an income-producing asset. The difference in value between "base milk" and "excess milk" is graphically displayed in the "Official Announcement of Uniform Prices for Base and Excess Milk" which is published monthly by the Puget Sound Milk Market Administrator pursuant to the requirements of section 1125.22 of the order. In addition, the income-producing nature of the purchased class I milk base is supported by the uncontroverted testimony of petitioner Gerrit Van De Steeg. Hence we think it was an income-producing asset during the time the 1967 amendment was in force.

A good explanation of the legal nature of class I milk base appears in the memorandum opinion of the unreported case of *Curtis* v. *United States* (W. D. Wash. 1972, 29 A.F.T.R. 2d 72-924), on appeal (C.A. 9, June 12, 1972). In contrast to this case, the *Curtis* case involved the *sellers* of class I milk base and the issue of whether or not the gain on the sale of this intangible asset was taxable as a long-term capital gain or a short-term capital gain. The plaintiffs argued that the holding period for purposes of capital gains treatment did not commence on

September 1, 1967 (i.e., the commencement date of the class I base plan), for the reason that this asset was already in existence prior to that date. In essence, the plaintiffs argued that there is no legal distinction or difference between the various base plans and the milk bases issued thereunder and that the same are merely part of a never-ending plan for the regulation of the marketing of milk. In rejecting this argument, the District Court made the following statements:

[Under the order *prior* to the 1967 amendment.]

a Market Administrator responsible for administering the order in the Puget Sound Area allotted what is termed a milk base to each of the plaintiffs for each of several years prior to 1967. The milk bases were allotted annually with each lasting from February 1st of one year to January 31st of the next.

A milk base is a quantity of milk expressed in pounds per day. The number of pounds allotted annually to each farmer generally was tied into his average daily production during the months of August through December of the preceding year. * * *

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

On September 1, 1967, a new base system became effective for the Puget Sound Marketing Area pursuant to an enabling amendment to the 1937 Act * * *. The new plan is commonly referred to as the "Class I Base Plan." * * * Under the new plan, farmers were no longer issued bases annually. Instead, a fixed amount of base was determined and allotted as of September 1, 1967, and no new base was created throughout the effective period of the amended market order. One was entitled to receive a share of the base if he (1) had been delivering milk regularly to a milk dealer in May of 1967, and (2) had a production history base. One had a production history base, in general, if he produced milk during the months of August through December of 1964, 1965, or 1966. The amount of base allotted to each farmer was tied into his highest production during these same periods. * * *

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

Plaintiffs argue in the alternative that the Class I milk base plan which became effective on September 1, 1967, did nothing more than give a new name to existing property. This argument misconceives the nature of a milk base. The definition of property set out in Merrill v. Commissioner, 40 T.C. 66, 74, 336 F. 2d 771 (9th Cir., 1964), is particularly applicable here: "Property, in the legal sense, means not the thing itself, but the rights which inhere in it." A milk base, although expressed as a quantity of milk, in its legal sense unquestionably is nothing more nor less than an aggregation of rights, primarily, the right to receive a premium price for a fixed quantity of milk. It does not suffice for plaintiffs to answer that each of them had such a right both before and after September 1, 1967. *The milk base, or aggregation of rights, granted each plaintiff on February 1, 1967* [vis the annual allocation under the pre-1967 terms of the order], *was solely the creation of the provisions of the market order which existed at that time. When the provisions of that market order were replaced, all rights flowing from the former provisions necessarily came to an end. New and substantially different rights, and hence a new asset, were created.* The gain which the plaintiffs realized from the sale of the Class I milk bases was gain which flowed

solely from the rights created by the amendment to the market order. Those rights, and the possibility of realizing that gain, had no existence prior to September 1, 1967. [Emphasis added.]

Thus, the class I milk base purchased by petitioners was solely the creation of the class I base plan in effect from September 1, 1967, until June 30, 1971. Prior to the existence of this particular base plan, these particular rights did not exist. Subsequent to the existence of this particular base plan, these particular rights did not exist. The class I milk base purchased by petitioners was completely different and distinct from any milk base previously or subsequently held by them.

The fact that petitioners' purchased class I milk base terminated completely on June 30, 1971, and that no portion thereof or any rights associated therewith were carried over into the new "Three Year Revolving Earned Base Plan" was clearly established by the testimony of Nicholas Keyock, Market Administrator of the Puget Sound Milk Marketing Order. Similarly, it is clear that the new "Three Year Revolving Earned Base" which was allocated to petitioners by the Milk Market Administration on July 1, 1971, was not substituted or exchanged for the class I milk base purchased by them pursuant to the class I base plan effective September 1, 1967.

The class I base plan which created the class I milk base purchased by petitioners always contained an express termination date. Initially this termination date was December 31, 1969, pursuant to the Food and Agricultural Act of 1965, Pub. L. 89–321, 79 Stat. 1187, and the Department of Agriculture order, amend. 14, 32 Fed. Reg. 11925–11927. It was then extended to December 31, 1970, pursuant to Pub. L. 90–559, 82 Stat. 996, and the Department of Agriculture order, amend. 20, 34 Fed. Reg. 13463–13464. Subsequently, it was extended for a final time until June 30, 1971, pursuant to the Agricultural Act of 1970, Pub. L. 91–524, 84 Stat. 1358, and the Department of Agriculture order, amend. 23, 36 Fed. Reg. 12276–12281. After June 30, 1971, all class I milk base (including that purchased by petitioners) ceased to exist.

The existence of the two extensions does not change the fact that at any particular moment in time the class I base plan and the class I milk base created thereby had a specific termination date. Petitioners agree that the creation of these two extension periods required a corresponding adjustment in the rate of depreciation of purchased class I milk base for purposes of subsequent tax returns in accordance with accepted income tax accounting practices. Thus, the effect of these two extension periods was to reduce the rate at which petitioners' purchased class I milk base could be depreciated, not to completely destroy the depreciability of purchased class I milk base. Finally, the fact that the class I milk base purchased by petitioners did, in fact, cease to exist on June 30, 1971, was established by the testimony of two witnesses.

Respondent asserts that the formal expiration date contained in the statute is not conclusive but is only one factor in determining whether the class I milk base had a useful life for only a limited period which could be estimated with reasonable accuracy. That is true, but in our opinion it was indeed an important factor. The law is clear that in determining depreciation a taxpayer is entitled to rely on the facts as they existed at the time his tax return is required to be filed. See *Pasadena City Lines, Inc.*, 23 T.C. 34, 39 (1954). When the petitioners' tax returns for 1967 and 1968 were filed the effective termination date of their purchased class I milk base was December 31, 1969. When their tax returns for 1969 and 1970 were filed the effective termination date of their purchased class I milk base had been extended to December 31, 1970. Petitioners were entitled to rely on these respective dates in computing the depreciation deductions for their purchased class I milk base.

In some cases where a depreciation deduction for an intangible asset was disallowed on the ground that the asset had an indeterminate useful life, the facts reveal that the stated life of the asset was customarily renewed or that its renewal was merely a formality. See, e.g., *V. P. Shufflebarger, supra*. But where the renewability of intangible rights is open to question, the taxpayer is entitled to rely on the original stated term of such rights for depreciation purposes. See, e.g., *WDEF Broadcasting Co.* v. *United States*, 215 F. Supp. 818 (E.D. Tenn. 1963) ; Rev. Rul. 67–113, 1967–1 C.B. 55. See also *Birmingham News Co.* v. *Patterson*, 224 F. Supp. 670 (N.D. Ala. 1963), affirmed per curiam 345 F. 2d 531 (C.A. 5, 1965). In the circumstances of this case we think the two extensions of the stated termination date were not "mere formality" and the class I milk base was not "customarily renewed" or "reasonably certain to be renewed indefinitely."

Respondent's argument fails to take into account the temporary character of the 1965 amendment (title I of the Food and Agriculture Act of 1965) as contrasted to the permanent nature of the Agricultural Marketing Agreement Act of 1937. The underlying Act is by its terms permanent in character. There is no stated terminus date in the underlying Act. Of course, it can be changed or terminated at any time by a new Act of Congress; but until a new Act is actually adopted the underlying Act is permanent legislation. By contrast, the 1965 amendment was temporary. The amendment itself states in section 103 thereof that it would cease to exist from and after December 31, 1969.

The 1965 amendment did not change or subtract from or in any way modify any of the alternatives which were available under the underlying Act. The 1965 amendment simply authorized an additional alternative method for distributing among the producers the proceeds

from the sale of their milk through the market-wide pool. This new alternative could be installed in any order if and when adopted by amendment to that order upon compliance with the procedural steps required by the Act.

The new alternative (as authorized by the 1965 amendment) contained two components: (1) A pro rata scaling down of production history bases to approximate class I utilization, and (2) the establishment of "class I bases" on a permanent or "quota-like" basis. Under the new alternative, if the actual production history of all producers serving a market were to give rise to twice as much production history base as there was class I utilization by consumers, the class I base allotted to each producer would be scaled down pro rata to his share of the class I sales; also, his share (as measured by his allotted class I base) would be awarded to him on a fixed basis irrespective of what he produced year by year. Finally, this permanent "quota-like" base would be calculated on the basis of each producer's actual production during a representative period antedating the adoption of the plan.

There is certainly a major difference between a law (such as the underlying Act) which by its terms and intent is to remain in force unless changed by Congress and one (such as the 1965 amendment) which by its language and intent is scheduled to terminate at a specified time unless a new Act is passed by Congress.

Respondent's argument also mistakenly implies that milk base plans are an absolute necessity and, accordingly, can be reasonably expected to continue in existence in some form or another indefinitely. The answer to this is that there are several geographical areas of the United States which are not regulated by a Federal milk-marketing order at all, let alone a milk base plan. Even assuming the existence of a Federal milk-marketing order, a milk base plan is *not* an absolute necessity to the operation of such an order. At the present time there are approximately 40 different milk-marketing orders which do not contain a base plan. In the absence of a base plan the producer simply receives a "blend" price for all of his milk, i.e., the average return of the "market-wide pool." More importantly, this aspect of respondent's argument ignores the legal difference between the various types of base plans and that the legal rights flowing from these various plans are completely different and distinct from each other. Thus, it is both factually and legally incorrect to maintain that the possibility of future milk base plans (of some form or another) would in any way render indeterminate the statutorily based useful life of petitioners' purchased class I milk base.

Respondent further states that the continued useful life of petitioners' purchased class I milk base was at the mercy of Congress or the Secretary of Agriculture and could be suspended, modified, or

terminated at any time. That the Congress or the Secretary of Agriculture had such power and may have elected to use it (but in fact did not) is totally irrelevant to the fact that petitioners' purchased class I milk base *at all times* had a stated termination date and did in fact terminate. Acceptance of this argument would require a taxpayer seeking to determine his tax liability to base his conclusions upon what Congress might do instead of upon what Congress actually has done.

In our opinion all of the cases cited and relied on by the respondent are factually distinguishable from the instant case. His authorities involve intangible assets which (1) had no time limitation (i.e., the grazing preferences in *V. P. Shufflebarger, supra,* and the California milk production quota in *Ralph Vander Hoek, supra*) or (2) were expressly renewable or customarily renewed (i.e., the television licenses in *KWTX Broadcasting Co.* v. *Commissioner,* 272 F. 2d 406 (C.A. 5, 1959), affirming 31 T.C. 952 (1959), the franchise contract in *Toledo TV Cable Co.,* 55 T.C. 1107 (1971), the cab license in *W. K. Co.,* 56 T.C. 434 (1971), and the liquor license in *Nachman* v. *Commissioner,* 191 F. 2d 934 (C.A. 5, 1951), affirming 12 T.C. 1204 (1949)). By contrast, the class I milk base purchased by the petitioners did have a stated termination date and was not expressly renewable, automatically renewable, or customarily renewed.

Accordingly, we conclude that the "quota-like" class I milk base purchased by the petitioners was an intangible, income-producing asset, used in their dairy-farming business, with a determinable useful life defined by the statute under which it was created. We therefore hold that the petitioners are entitled to their claimed depreciation deductions under section 167(a) of the Code and the regulations promulgated thereunder.

To reflect uncontested adjustments and our conclusion on the disputed issue,

*Decisions will be entered under Rule 50.*