PASADENA CITY LINES, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 42412.     Filed October 15, 1954.

*C. William Maxeiner, Esq.*, for the petitioner.
*Aaron S. Resnik, Esq.*, for the respondent.

[3] This Court has reached a like result in at least two other cases, which were decided in Memorandum Opinions.

OPINION.

RICE, *Judge:* This proceeding involves deficiencies in income and excess profits taxes determined against Pasadena City Lines, Inc. (hereinafter referred to as petitioner), as follows:

| Year | Tax | Deficiency |
|------|-----|-----------|
| 1944 | Excess profits | $8, 647. 64 |
| 1945 | Excess profits | 27, 123. 81 |
| 1946 | Income | 5, 091. 84 |

The issues to be decided are: (1) Whether the cost to petitioner of acquiring a franchise to operate a motor coach transportation system was $134,177.37; and (2) whether the cost of such franchise may be depreciated over a 10-year period.

Petitioner claims, in its petition, an overpayment of excess profits taxes for the taxable year 1944 in the amount of $1,000.04.

All of the facts were stipulated, are so found, and are incorporated herein by this reference.

Petitioner was incorporated in the State of California on August 24, 1940, as an operating subsidiary of Pacific City Lines, Inc. (hereinafter referred to as the parent company), for the purpose of operating a local public motor coach transportation system in the city of Pasadena, California. For the years here involved, petitioner filed its income and excess profits tax returns with the collector of internal revenue for the first district of California. Petitioner has kept its books and records, and filed its returns, on a calendar year basis, using the accrual method of accounting.

The charter of the City of Pasadena vests in the city exclusive control over the use of its streets; and the city is authorized to grant franchises to use the streets for the purpose of providing public transportation. Pursuant to such franchises, local public transportation in the city was provided, by both motor coach and street car, by the Pacific Electric Railway Company (hereinafter referred to as Pacific) prior to and during 1940. Pacific also operated an interurban passenger service between Pasadena and Los Angeles.

In 1940, it became known that Pacific desired to withdraw from substantially all of its local passenger operations. Petitioner's parent company conducted negotiations with Pacific, on petitioner's behalf, for the purchase of Pacific's local transportation franchise rights, facilities, and equipment. Irrespective of its purchase of Pacific's franchise rights, it was necessary that petitioner obtain a franchise directly from the city. The parent company, therefore, filed a franchise application with the board of directors of the City of Pasadena, paying a $100 application fee on petitioner's behalf. The application requested that an exclusive 10-year franchise to operate a public motor coach transportation system be granted to petitioner; and stated the

intention to acquire all the franchise rights, facilities, and equipment of Pacific, used or useful, in the operation of Pacific's public transportation system in the city before the exercise of any of the privileges which would be conferred by the franchise applied for.

Thereafter, the parent company acquired from Pacific, on petitioner's behalf, all of Pacific's local franchise operating rights in the city, subject to the consent of the city and approval by the Railroad Commission of the State of California. Then, on October 11, 1940, the board of directors of the city granted the petitioner a 10-year franchise, commencing on January 19, 1941, for the operation of a local public motor transportation system over certain designated streets. This franchise was expressly stated to be subject to any and all franchises previously granted to Pacific stating, in part, as follows:

PROVIDED, HOWEVER, that the franchise hereby granted shall be subject to any and all franchises previously granted by City under which the Pacific Electric Railway Company or its successors in interest now or may hereafter operate a transportation system in the City of Pasadena, and nothing in this paragraph shall be deemed a limitation on such franchises or any of them previously granted by City.

It also provided for the abandonment of all rails, ties, and incidental facilities of the rail transportation system to the city. In addition, petitioner was required to pay $6,000 to the city for the rail system's overhead facilities and remove them from the streets. Petitioner did not intend and had no power, under its franchise, to operate a rail transportation system in the city.

The Railroad Commission of the State of California, which exercises regulatory authority over public transportation systems in California, approved the agreement between petitioner's parent company and Pacific. It authorized petitioner to purchase the following property from Pacific, at the prices stated below:

| | | |
|---|---|---:|
| 39 motor coaches | | $42,712.10 |
| Real property | | 58,100.00 |
| Garage equipment & tools | | 3,365.00 |
| Operating rights: Motor coach | $55,863.08 | |
| Rail | 63,359.82 | 119,222.90 |
| | | $223,400.00 |

Petitioner paid $223,400 to Pacific for the above mentioned property, and commenced operation of its motor transportation system on January 19, 1941. Pursuant to the provisions of its franchise, petitioner transferred to the city title to all abandoned rails, ties, and incidental facilities in place which were formerly used by Pacific in its operation of a street railway system. Also, in accordance with the terms of its franchise, petitioner paid to the city $6,000 for all overhead rail facilities of the street railway system and then had them

removed. No administrative or supervisory personnel for petitioner's operations were obtained from Pacific or any of its affiliates.

Payments in the amount of $2,008.75 were made by or on behalf of petitioner during 1940 and 1941 for legal services rendered in securing petitioner's local motor coach franchise and in consummating the purchase transaction with Pacific. The expenses of officers and employees, incurred in securing petitioner's franchise and in negotiating the purchase transaction with Pacific, were paid in the amount of $6,845.72 during 1940 and 1941. Seventy-five per cent of these payments for legal services and officers' and employees' expenses are allocable to the cost of petitioner's franchise.

In authorizing the issuance of capital stock by petitioner, the Railroad Commission stated that, under State law, it could not permit stock to be issued in payment for the franchises nor could the franchises be used as an element in determining rates.

Petitioner capitalized the following expenditures on its books of account as the cost of acquiring its franchise:

| | |
|---|---|
| Operating rights: Motor coach_____ $55, 863. 08 | |
| Rail_____ 63, 359. 82 | |
| | [1] $119, 222. 90 |
| Removal of overhead rail facilities_____ | 6, 000. 00 |
| Franchise filing fee_____ | 100. 00 |
| Legal fees_____ | 2, 008. 75 |
| Expenses of officers and employees_____ | 6, 845. 72 |
| | $134, 177. 37 |

This was in accordance with the uniform system of accounts prescribed by the Railroad Commission. In its annual reports, which were required to be filed with the Railroad Commission, petitioner amortized these expenses in accordance with the 10-year period of its franchise. Each of such reports was duly approved by the Railroad Commission. Petitioner took deductions for the depreciation of these expenses, pursuant to the 10-year period, on "Schedule J—Depreciation" of its Federal income and excess profits tax returns for the years 1941 and 1944–1947. Depreciation deductions were taken by its parent company on consolidated returns filed for the years 1942 and 1943. The respondent, after an audit and examination of the returns filed by petitioner for 1941 and the consolidated returns filed for 1942 and 1943, allowed the deduction of such depreciation expenses for such years.

On September 1, 1949, the board of directors of the city adopted an ordinance repealing the previous ordinance which had granted petitioner a 10-year franchise, commencing on January 19, 1941. This

---

[1] Petitioner entered only the total amount on its books and made no allocation between the cost of the motor coach and rail franchise operating rights acquired from Pacific.

new ordinance granted petitioner, under different terms and conditions, a franchise for a period of 20 years, to be effective as of October 2, 1949. It stated that this second franchise was to be "in lieu and in continuation of the franchise" previously granted to petitioner.

Respondent disallowed the depreciation deductions taken by petitioner with respect to its franchise on its returns for 1944, 1945, and 1946. In his notice of deficiency, respondent stated that the deduction "claimed as amortization of franchise costs and other intangibles in connection with the acquisition of operating rights is disallowed for the reason that the costs do not represent expenditures for an asset the use of which is definitely limited in duration."

Respondent argues (1) that petitioner has overstated the cost of its franchise; and (2) that regardless of the cost, no part of it is depreciable because the franchise was actually for an indeterminate period.

We shall discuss the second issue first, since its resolution in respondent's favor would eliminate any need to discuss the cost basis of petitioner's franchise.

It is clear that a franchise which is limited in duration is properly depreciable during its term pursuant to section 23 (1) of the Internal Revenue Code of 1939 and the regulations thereto.[2] *Cleveland Railway Co.*, 36 B. T. A. 208 (1937). However, if not limited to a definite term, it must be regarded as a nondepreciable capital asset. *Morris Nachman*, 12 T. C. 1204 (1949), affd. 191 F. 2d 934 (C. A. 5, 1951). Respondent acknowledges that the franchise under which petitioner operated during the years here in issue was issued for a period of 10 years, but contends that this alone does not prove that it was properly depreciable over its 10-year term. He argues that it cannot be regarded as limited in duration unless petitioner proves that there was no reasonable expectation of renewal.

This issue was before the Board in *Cleveland Railway Co.*, *supra*, and, on facts far less favorable to the taxpayer than those of the instant case, it was held that the franchise therein was limited to a definite term, and not perpetual. The Cleveland Railway Co. had twice obtained renewals of its franchise prior to the taxable year involved. Nevertheless, the Board held that "the fact that such re-

---

[2] SEC. 23. DEDUCTIONS FROM GROSS INCOME.
In computing net income there shall be allowed as deductions :

    *        *        *        *        *        *        *

  (1) DEPRECIATION.—A reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—
    (1) of property used in the trade or business, or
Regulations 111 :
  SEC. 29.23 (1)-3. DEPRECIATION OF INTANGIBLE PROPERTY.—Intangibles, the use of which in the trade or business or in the production of income is definitely limited in duration, may be the subject of a depreciation allowance. Examples are patents and copyrights, licenses, and franchises. * * *

newals or extensions have been made is, in itself, substantial evidence that such renewals or extensions were necessary in order to keep it in force." In the instant case, during the taxable years here in issue, no renewal of petitioner's franchise had been arranged, nor does the record indicate that one was then being negotiated. The allowance for depreciation is to be determined in accordance with the facts existing at the end of the period for which the return is made, Regulations 111, section 29.23 (1)–5; *Morganton Full Fashioned Hosiery Co.*, 14 T. C. 695 (1950). Therefore, upon the basis of the record as a whole, and considering all of the facts and circumstances relating to the granting, extension, and renewal of franchises by the City of Pasadena which are available to us in the record, we hold that the cost of petitioner's franchise was properly depreciable at a 10 per cent rate during each of the years here in issue.

The cases cited by respondent are not in point since they involve situations where 1-year licenses were acquired and there was a long-established custom of annual renewal of such licenses. *Tube Bar, Inc.*, 15 T. C. 922 (1950) ; *Morris Nachman, supra.*

Turning now to the basis to be used by petitioner in depreciating the cost of its franchise, the elements of cost claimed by petitioner consist of the franchise filing fee, the payment to the city for the overhead rail facilities, the franchise operating rights acquired from Pacific, legal fees, and the expenses of officers and employees. The total cost of these various items aggregates to $134,177.37.

The various expenses incurred in acquiring a capital asset are not deductible as business expenses in the year in which they are paid or incurred. *Anahma Realty Corporation* v. *Commissioner*, 42 F. 2d 128 (C. A. 2, 1930), certiorari denied 282 U. S. 854 (1930). Such costs must be capitalized and amortized or depreciated over the life of the asset. *Central Bank Block Association*, 19 B. T. A. 1183 (1930), affd. 57 F. 2d 5 (C. A. 5, 1932). Beginning with the $100 franchise filing fee paid to the city, there is no doubt that this item is directly attributable to the franchise which was subsequently granted to petitioner and, hence, depreciable over its 10-year term. The $6,000 paid to the city for the overhead rail facilities of the former rail transportation system falls into the same category, and it appears that respondent has conceded this. Thus, in his brief, he requests a finding of fact that the "only payments made by and on behalf of petitioner to the City of Pasadena in consideration for the granting of its first franchise commencing in January 1941 were $6,000 in connection with rail removal and a $100 application fee."

The major item in dispute is the $119,222.90 paid to Pacific for its motor coach and rail operating rights. Respondent contends that this sum included payment for such intangibles as goodwill, and an un-

limited covenant not to compete; and that such intangibles are of an indeterminate life and, hence, not depreciable. However, the stipulated facts clearly state that the $119,222.90 was paid for Pacific's motor coach and rail operating rights, and we find nothing in the record to contradict or modify that. Pursuant to the terms of its franchise from the city, petitioner was required to acquire franchise rights which the city had previously granted to Pacific to operate a transportation system over many of the same routes. Until it had obtained these franchise rights from Pacific, petitioner could not commence operations under its own franchise. They were a distinct part of the cost of petitioner's franchise, and we can see no reason for allocating any part of their stipulated cost to goodwill or a covenant not to compete. The record does not indicate that goodwill or a covenant not to compete was considered by petitioner and Pacific during their negotiations for the transfer of Pacific's operating rights and certain of its fixed assets. Moreover, when a business is conducted pursuant to exclusive rights granted it by a governmental body, as is the case here with Pacific and petitioner, it cannot have any goodwill separate and distinct from the value of its monopolistic franchise. *Omaha* v. *Omaha Water Co.*, 218 U. S. 180, 202 (1910) ; cf. *Floyd D. Akers*, 6 T. C. 693 (1946).

Nor do we believe that the unexpired terms of the various franchise rights acquired from Pacific, whether longer or shorter than the 10-year term of petitioner's franchise, can affect the inclusion of the cost of such rights in the basis used by petitioner to amortize its franchise. Petitioner did not and could not operate under these franchises acquired from Pacific. It operated solely on the authority of the franchise granted directly to it by the city. Pacific's franchises, regardless of their remaining unexpired terms, constituted a cost element of petitioner's franchise and not franchises which were to be individually amortized according to their respective terms. The same rationale applies to the $63,359.82 cost of the rail operating rights. It is immaterial that petitioner did not and could not operate a rail transportation system in the city. Pursuant to the terms of its franchise, it was necessary that it acquire such rail rights and they thereby became a direct cost of petitioner's motor transportation system franchise. Consequently, the entire $119,222.90 paid to Pacific for its motor and rail franchise rights is includible in the cost of petitioner's franchise.

The two remaining elements of petitioner's franchise cost here in issue are the $2,008.75 expenditure for legal fees and the expenses of officers and employees in the amount of $6,845.72. The stipulation provides that payments for these two items were incurred and made "in securing the franchise * * * and in consummating the purchase

transaction with Pacific Electric Railway Company." This "purchase transaction" with Pacific involved the acquisition of certain of Pacific's motor coaches, real property, and garage equipment in addition to the purchase of its operating rights. Insofar as a portion of the legal fees and the expenses of officers and employees was incurred in the acquisition of items other than the operating rights, they are not includible in the cost of petitioner's franchise. Difficult as it may be in view of the limited evidence on this point, we must determine what portion of these two expenditures was incurred in securing the franchise from the city and in negotiations with Pacific for the purchase of its operating rights. *Tube Bar, Inc., supra; Cohan* v. *Commissioner*, 39 F. 2d 540 (C. A. 2, 1930). In view of the fact that the cost of the operating rights ($119,222.90) constituted over 50 per cent of the total amount of the "purchase transaction" with Pacific ($223,-400), and that a substantial part of the expenditures for legal fees and the expenses of officers and employees was undoubtedly incurred in securing such operating rights and the franchise from the city, we have found as a fact that 75 per cent thereof is attributable to the cost of petitioner's franchise.

Petitioner has claimed an overpayment in excess profits taxes of $1,000.04 for the year 1944. Pursuant to our determination of the issues herein, the proper amount of such overpayment, if any, will be determined under a recomputation under Rule 50.

*Decision will be entered under Rule 50.*