THE CHRONICLE PUBLISHING COMPANY, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 8550–74.  Filed March 21, 1977.

*W. Ronald Ingram, James R. Moore,* and *Margaret H. Edwards,* for the petitioner.
*William E. Saul,* for the respondent.

FEATHERSTON, *Judge:* Respondent determined the following deficiencies in petitioner's Federal income taxes:

| Year | Deficiency | Year | Deficiency |
|------|-----------|------|-----------|
| 1967 | $2,528 | 1970 | $50,850 |
| 1968 | 6,046 | 1971 | 56,195 |
| 1969 | 40,788 | | |

A concession having been made by respondent, the only issue remaining for decision is whether the useful lives of cable television franchises and easements related thereto owned by petitioner's subsidiaries can be estimated with reasonable accuracy so that depreciation deductions in respect of those assets are allowable under section 167(a)(1).[1]

### FINDINGS OF FACT

### 1. *General*

Petitioner, the Chronicle Publishing Co. (hereinafter referred to as petitioner or sometimes Chronicle), is a Nevada corporation and throughout the taxable years in controversy was the owner of the San Francisco Chronicle, a daily newspaper of general circulation in the San Francisco Bay area. Petitioner is also the common parent of an affiliated group of corporations, all of which maintain their books and records on an accrual method of accounting based upon the calendar year. At the time its petition was filed, petitioner's principal office was located in San Francisco, Calif.

For the taxable years in controversy, petitioner and its affiliated group filed consolidated U.S. corporation income tax returns. The return for 1967 was filed with the Director of Internal Revenue in San Francisco, Calif. The returns for 1968 through 1971, inclusive, were filed with the Internal Revenue Service Center in Ogden, Utah.

### 2. *Petitioner's Affiliated Group of Corporations*

During all 5 taxable years before the Court, Chronicle Broadcasting Co. (hereinafter referred to as Broadcasting), Western Communications, Inc. (hereinafter Wescom), County

---

[1] All section references are to the Internal Revenue Code of 1954, as in effect during the tax years in issue, unless otherwise noted.

TV Cable (County), Western TV Cable (Western), and Concord TV Cable (Concord) were included in the Chronicle affiliated group. State TV Cable (State) was included in the affiliated group during 1969, 1970, and 1971. Monterey Peninsula TV Cable (Monterey) was included in the affiliated group during 1971 only.

Broadcasting is, and throughout the taxable years in controversy was, a wholly owned subsidiary of petitioner and the owner-operator of television station KRON-TV in San Francisco, Calif.

Wescom is, and throughout the taxable years in controversy was, a wholly owned subsidiary of petitioner and is the holding company for all of petitioner's cable television subsidiaries. It owns all the issued and outstanding capital stock of County, Western, State, and Monterey, and 80 percent of the issued and outstanding capital stock of Concord.

County was incorporated as Hi Fidelity TV Cable System Co. but changed its name to County TV Cable on March 21, 1967. From August 4, 1966, until July 31, 1968, 80 percent of County's capital stock was owned by petitioner and 20 percent was owned by an individual otherwise unrelated to petitioner and its subsidiaries. On the later date all the outstanding shares of County were transferred to Wescom, which continues to be the sole shareholder of County.

Western was incorporated as Western Cable Television Co. but changed its name to Western TV Cable on March 23, 1967. All of Western's capital stock was owned by petitioner until July 31, 1968, when petitioner transferred it to Wescom, which continues to be the sole shareholder of Western.

Concord was incorporated as Western Communications, Inc., but changed its name to Concord TV Cable on March 23, 1967. Until March 1, 1968, petitioner owned 88.88 percent of the capital stock of Concord and the balance was owned by Newhall Land & Farming Co. (Newhall), a corporation otherwise unrelated to petitioner and its subsidiaries. On March 1, 1968, an additional 800 shares of Concord's capital stock were issued to Newhall, reducing petitioner's shareholding to 80 percent. On July 31, 1968, petitioner transferred all its shares of Concord to Wescom, which continues to hold 80 percent of the capital stock of Concord.

All the capital stock of State and Monterey is, and during portions of the taxable years in issue was, owned by Wescom.

### 3. *Petitioner's Cable Television Franchise Acquisitions*

Charles de Young Thieriot (hereinafter Thieriot) is the president of petitioner, the editor-publisher of its daily newspaper, and chairman of the board of Wescom. During the years in issue, Thieriot was the chief executive of petitioner and its subsidiaries and was, and still is, responsible for establishing corporate policy. He has final authority concerning the business affairs and holdings of each of those corporations, including their cable or community antenna television franchises and systems.

Community antenna television systems (hereinafter referred to as CATV systems) receive the signals of television broadcasting stations, amplify them, transmit them by cable or microwave, and ultimately distribute them by wire to the receivers or their subscribers. Such systems characteristically do not produce their own programming and do not recompense producers or broadcasters for the programming which they receive and redistribute. They charge their subscribers on a monthly or annual basis for their redistribution services.

Thieriot was assisted by Harold See (hereinafter See), an engineer, who was in charge of petitioner's television and radio operations. Thieriot and See first became interested in entering the cable television industry as a means of extending the signal emitted by Broadcasting's television station into those areas in which its signal was not being received satisfactorily. Together, on behalf of petitioner, Thieriot and See made a decision in 1965 to enter into the field of cable television, decided upon certain franchises to be acquired, negotiated the acquisition of such franchises, and supervised construction of petitioner's cable systems.

Prior to the mid-1960's, the only governmental regulation of cable television was at the city-county level, and franchises were issued by the governing authorities of cities and counties. Franchising authorities knew very little about cable television. There were no source materials available at the time to assist them in developing their franchises, and they usually drafted their franchises without conducting any substantial inquiry.

The franchises of this period were short documents containing only minimal provisions authorizing the installation of the equipment and the use of public streets and ways, a basic provision for subscriber rates, and a requirement that the franchisee pay a franchise fee to the franchising authority. The franchises acquired by petitioner's subsidiaries, described below, followed this pattern.

To commence business during this period, the prospective cable operator simply went to the franchising authority and requested a franchise permitting him to cross public streets and ways with his cable. There was generally no formal application or public hearing procedure in connection with the granting of the franchise. The primary concerns of the franchising authorities during this period were to provide a new service to the community and to generate additional revenues for the local government by requiring payment of a franchise fee.

Upon granting of the franchise, the cable operators then strung the cables on telephone or power company poles or laid them underground in trenches on easements owned by those utility companies.

Petitioner's subsidiaries negotiated agreements with Pacific Telephone & Telegraph Co. (P.T. & T.) or Pacific Gas & Electric Co. (P.G. & E.) for the use of their poles and easements. Throughout the years in issue, the P.T. & T. agreements, terminable on 6 months' notice, called for payments of $2.50 per pole, with a further charge per pole for additional equipment attached to the poles. In 1971 the per-pole charge was increased to $3.25 a month after negotiations prior to which P.T. & T. sought $7.50 per pole. The P.G. & E. pole agreements were terminable on 30 days' written notice. With minor exceptions, petitioner's subsidiaries have not negotiated with local property owners for easements across their properties.

The following table shows the name of the acquiring subsidiary, the grantor of the franchise, the date of the acquisition of the franchise, the expiration date of the franchise, and the approximate number of years remaining in the life of the franchise at the time of its acquisition:

| Subsidiary | Grantor | Date of acquisition | Expiration date | Approximate years remaining |
|---|---|---|---|---|
| County | San Mateo County.................. | 8/4/66 | 8/10/75 | 9 |
|  | San Mateo County.................. | ¹4/11/67 | 4/11/77 * | 10 |
| Western | San Francisco City and |  |  |  |
|  | County.................................. | ²4/8/66 | 8/8/87 | 21 |
|  | City of South San Francisco.. | 6/19/67 | 7/14/78 | 11 |
|  | City of Brisbane³...................... | 2/8/68 | 7/14/77 | 9 |
| Concord | Contra Costa County.............. | 8/16/66 | 9/13/86 | 20 |
|  | City of Concord ....................... | 2/14/67 | 3/16/87 | 20 |
|  | City of Clayton'........................ | 4/12/68 | 10/24/86 | 18 |

¹ No operations have been carried out under this franchise because County could not arrange for the use of P.T. & T. poles for stringing television cables.

² This franchise was terminated because Western could not arrange for the use of poles for stringing television cables.

³ The City of Brisbane franchise was granted "for such period of time as said WESTERN TV CABLE shall have a franchise for television service to the City of South San Francisco."

The following table shows as of 1971 the number of subscribers served by County, Western, and Concord, the number of miles of underground cable, the number of miles of overhead cable strung on poles, and the total number of poles, all of which poles are owned by others:

| Subsidiary | Subscribers | Underground miles | Overhead miles | Poles |
|---|---|---|---|---|
| County ...................................... | 1,507 | 5.64 | 37.90 | 1,352 |
| Western ..................................... | 8,522 | ¹17.30 | ¹81.26 | 3,636 |
| Concord..................................... | 18,694 | 38.30 | 236.50 | 7,899 |

¹ Current figures based on usage of 3,608 poles; miles figures not available for 1971.

On December 19, 1967, in consideration of stock with a value of $40,000, Newhall granted to Concord an easement over land owned by Newhall for use by Concord in connection with the franchise granted by the County of Contra Costa. This easement terminates on the expiration of the franchise.

By 1969 petitioner had gained experience in the cable television industry through County, Western, and Concord and viewed it as an industry with great growth potential. By then, however, franchises in the most desirable areas were held by other investors. To acquire additional operating rights, it was therefore necessary to buy existing franchises from various owners. As shown in the following table, during 1969 and 1971 State and Monterey acquired franchises in communities outside the San Francisco area:

| Subsidiary | Grantor | Date of acquisition | Expiration date | Approximate years remaining |
|---|---|---|---|---|
| State | City of Chico | 4/1/69 | 10/12/84 | 16 |
| | County of Butte | 4/1/69 | 9/1/84 | 16 |
| | City of Corning | 7/1/71 | 5/25/89 | 18 |
| | City of Orland | 7/1/71 | 1/13/89 | 18 |
| | County of Glenn | 7/1/71 | 4/12/90 | 19 |
| | City of Willows | 7/1/71 | 12/31/84 | 14 |
| | County of Glenn | 7/1/71 | 9/7/85 | 14 |
| Monterey | City of Monterey | 12/15/71 | 11/3/81 | 10 |
| | City of Carmel-By-The-Sea | 12/15/71 | 12/29/82 | 11 |
| | County of Monterey | 12/15/71 | 7/30/82 | 11 |

For convenience, the franchise granted to Monterey by the City of Carmel-By-The-Sea will be referred to sometimes herein as the Carmel franchise and the name of that city will be referred to as Carmel.

The following table shows as of 1971 the number of subscribers served by State and Monterey, the number of miles of underground cable, the number of miles of overhead cable strung on poles, and the total number of poles, all of which poles are owned by others:

| Subsidiary | Subscribers | Underground miles | Overhead miles | Poles |
|---|---|---|---|---|
| State | 10,715 | 2.7 | 210.0 | 7,906 |
| Monterey | 9,261 | 20.0 | 165.0 | 6,172 |

Rules subsequently adopted by the Federal Communications Commission (FCC) prohibited further acquisitions by corporations controlled by petitioner within a prescribed area served by Broadcasting's television station KRON-TV.

With the exception of the Willows and Glenn County franchises, all the subject franchises are nonexclusive so that other persons at any time could be granted a franchise covering the same area even before expiration of the subject franchise.

## 4. Factors Considered in Acquiring Franchises

Petitioner's entry into the cable television business was based upon a carefully studied decision. In determining whether to acquire a franchise, petitioner considered, among other things, the condition of the physical assets of the system at the time of its prospective acquisition, the terms and provisions of the franchise itself, particularly the period

remaining before its expiration, and whether petitioner could recover its investment over the remaining term of the franchise. Physical inspections were made of each system by petitioner's engineers to determine the type of cable and other equipment used in the system, its age and condition, whether and to what extent it would have to be replaced, and, if so, the cost of replacement.

In addition to a physical inspection, petitioner made a careful investigation of business prospects of each system, conducted market surveys, and consulted independent advisers. The books and records of the prospective seller were always investigated to determine the income potential. The degree to which the prospective seller had already penetrated the subscriber market and the extent to which the market was saturated were taken into account, for the relationship between the number of existing subscribers and the number of prospective additional subscribers was an indication of the system's expansion potential.

Financial projections were made and the projected operating receipts analyzed to determine whether the anticipated operating receipts from the system, together with the expected sale value of the system at the end of the franchise, would make the acquisition of the franchise and system a worthwhile investment. This and other data were used by petitioner in negotiating an appropriate purchase price for each franchise and system. In making its projections, petitioner assumed that it would not obtain a renewal of the franchise upon expiration of the stated term of the franchise.

Petitioner considered the remaining term of the franchise to be extremely significant. During the taxable years in controversy, a remaining franchise term of 8 years was accepted as normal in the cable television industry to enable the cable operator to generate operating receipts which, when added to the anticipated sale value of the system at the end of the franchise, would permit the operator to recover his investment in the franchise and system. Each of the franchises acquired by petitioner's subsidiaries had at least 8 years remaining under its existing terms.

In connection with the transfers of the cities of Clayton, Monterey, and Carmel franchises to subsidiaries of petitioner, the franchising authorities conditioned their approval of the

transfers upon one or more of the following factors: (1) Increases in the franchise fees payable to the franchising authorities; (2) controls over future subscriber rates; and (3) installation and service to certain city facilities. In all other instances, the franchising authorities approved transfers of the franchises to petitioner's subsidiaries without extension of the terms of the franchises or any other modifications to the provisions thereof. In every instance, approval of the franchising authority was obtained before the franchise was transferred.

Some of the subject franchises were renegotiated and amended after they were acquired by petitioner's subsidiaries. The nature of these amendments was to increase franchise fees payable to the franchising authorities; require free service to schools, fire stations, and churches; give the franchising authorities control over subscriber rates; increase the area covered by the franchise; and conform franchise provisions to those of a neighboring community. All these amendments increased the burdens of, or imposed limitations upon, the franchisee.

### 5. Conditions for Renewals of the Franchises

None of the subject franchises and none of the enabling ordinances under which such franchises were granted contain renewal options or any other provisions under which any of petitioner's subsidiaries or the franchising authority can renew or extend unilaterally the term of any franchise. None of these franchises or enabling ordinances contains any prohibition, restriction, or limitation upon the rights of other persons at the expiration of the subject franchises to apply for and to be granted a franchise covering the area presently covered by one of such franchises.

Under existing or reasonably anticipated procedures, application for a renewal or an extension of the subject franchises or the grant of a new franchise upon expiration of one of the subject franchises will depend upon a considered decision on the part of petitioner's subsidiaries, and favorable action thereon will be required by the franchising authority of the city or county responsible for granting the franchise. Since competitive applications will be solicited or accepted and objectively evaluated by the franchising authorities, peti-

tioner's subsidiaries may have to compete with others in respect of any application they may make for such a renewal, extension, or new franchise. Pursuant to FCC rules and regulations, public hearing to consider the legal, financial, technical, character, and other qualifications of petitioner's subsidiaries, together with the adequacy and feasibility of their construction arrangements, will be required in connection with any such application, and it will be necessary to obtain a certificate of compliance from the FCC in order to continue the operation of a system.

Only one of the subject franchises is not the initial franchise for the area it covers. Alarm Corp., the original grantee of the Carmel franchise, initially was granted a nonexclusive franchise to operate a CATV system in the City of Carmel for a period of 15 years ending April 4, 1967. That franchise expired in accordance with its terms. Before granting a new franchise, the City of Carmel continued an investigation that it had commenced in September of 1966. In the course of that investigation, the City of Carmel considered operating the cable system itself, solicited competitive applications from many other companies for the franchise, and adopted a new ordinance governing cable franchises and operations thereunder.

As Carmel had one of the few completely underground systems in the country and had experienced considerable technical problems with that system, Alarm was the only cable operator to submit an application for the Carmel franchise under the new ordinance. It was nonetheless only after extended negotiations, investigation, and public hearings that the Carmel City Council passed and adopted a resolution granting the present Carmel franchise to Alarm. The new franchise contained terms and conditions materially and substantially different from those of the expired franchise.

With the exception of one of the San Mateo County franchises acquired by County, none of the subject franchises has expired since petitioner acquired it. Accordingly, none of petitioner's subsidiaries has ever had the occasion to apply for, or to be granted, a renewal or extension of any of their existing franchises or, with the exception of County, to apply

for, or to be granted, a new franchise to replace an expired franchise.

The San Mateo County franchise acquired by County on August 4, 1966, expired on August 10, 1975. The Board of Supervisors of that county has since adopted new rules and regulations governing the granting of cable franchises and operations. County has applied for a new franchise in accordance with those rules. At the time of the trial, the application had not been acted upon by the Board of Supervisors of San Mateo County, but County is continuing its operations. The board has reserved the right to solicit competitive applications. Any new franchise granted to County pursuant to those rules will be preceded by public hearings. In the case of one applicant, Crystal-Brite, unrelated to petitioner, for the renewal of its franchise, the San Mateo County Board of Supervisors on June 24, 1975, denied the renewal application, advertised for other applications, and finally awarded the franchise to another applicant.

## 6. *Technological Advances in the Industry*

The increasing complexity of the cable television franchises reflects the increasingly wider range of services being made possible as a result of dramatic technological advances in the industry. Perhaps the most important single technological development in the cable television industry was the transistor in the mid-1960's. With the use of transistors, smaller, more lightweight amplifiers became possible, thereby eliminating the need to attach amplifiers to utility poles. Instead, the amplifiers could be attached to the cable support wiring between the utility poles. This allows greater flexibility to the franchise operator in locating his amplifiers to provide more efficient service.

Transistorized amplifiers also increased channel capacity, thereby giving subscribers a greater channel selection. By 1968 cable television systems were able to provide 20-channel capacity, and the technical capability of providing greater capacity was available. Improved antenna designs enabled the cable operator to receive a multiplicity of channels. The development of the directional coupler tap reduced reception interference. In prototype were devices providing two-way service and permitting the subscriber to call for information,

data, or services. During 1965 to 1971, two-way systems were in actual use in certain locations in the United States. Also being developed at the time was a "frame-grabbing" and picture-storage system which would allow an individual subscriber to record and store a single transmitted television image which could then be viewed as a still picture on the television screen.

With the development of increased channel capacity, two-way capacity, and other technological advances, and the increasing volume of publicity surrounding these advances, public interest in cable television grew rapidly during the 1965–71 period. The public as well as the industry began to anticipate an ever expanding range of services that could be delivered by cable television, including, among others, local origination of programming, public interest programming, and banking and shopping. All these and other technological advances increased the local, State, and Federal regulatory authorities' interest in responding to the public demand for improved local cable television service.

## 7. *Governmental Regulation of the Cable Television Industry*

In 1959 legislation to authorize the FCC to regulate cable television was considered but not enacted. Nevertheless, in 1966 the FCC asserted jurisdiction over both cable and microwave systems and announced rulemaking proceedings. In 1967 the FCC issued a further statement regarding cable television franchising and declaring that the FCC had the power to override local franchise provisions.

In 1968 the Supreme Court upheld the FCC's assertion of jurisdiction over CATV in *United States v. Southwestern Cable Co.*, 392 U.S. 157 (1968). That same year, in *Fortnightly Corp. v. United Artists*, 392 U.S. 390 (1968), it also held that CATV systems were not liable for copyright payments on local signal carriage, thus providing stimulus for local origination of programs.

By 1968 the FCC had changed its perception of cable television, no longer viewing it merely as a retransmission medium but treating it as a communication industry in and of itself. In that year the FCC proposed a comprehensive scheme for the regulation of cable television, including, among other things, the regulation of advertising, sponsorship identifica-

tion, prohibition of obscenity and lotteries, and compliance with the equal-time-and-fairness doctrines; it announced that the FCC would develop specific technical standards for cable systems; it proposed public, educational, and governmental access channels and rules for signal carriage and the importation of distant signals; and it adopted reporting requirements.

In 1970 the FCC created the Cable Television Bureau to handle its work in supervising the industry. The FCC decided not to license cable television systems (as it has broadcast systems) but to provide a dual jurisdiction format whereby a franchisee must meet certain minimum standards imposed by the local franchising authority before the system will be given an FCC certificate of compliance. Such a franchise may be granted only after public hearings which comply with due process and full and open disclosure requirements.

On each application for a certificate of compliance, i.e., authority to operate the system, the FCC will examine the proposed franchise for, among other things, compliance with its regulations in the following areas:

(1) The process for the selection of the franchisee;

(2) Construction of the system to assure, among other things, that no discrimination results in favor of the more affluent parts of the city, thus ignoring the poor areas;

(3) Franchise duration, generally 15 years;

(4) Subscriber rates to assure that rate changes shall not be made except as authorized by the franchising authority after appropriate public proceedings meeting due process requirements;

(5) Service complaints;

(6) Franchise fees in the range of 3 to 5 percent of the franchisee's gross subscriber revenues per year from CATV operation in the community; and

(7) Channel capacity. All new CATV systems in the major markets carrying broadcast channels must also provide, for each broadcast channel carried, an additional channel for the following uses: (a) Two-way communication, i.e., technical capacity for nonvoice return communication; (b) public access; (c) education access; (d) local government access; and (e) lease access.

While these regulations are subject to future revision, any new franchise granted to petitioner's subsidiaries on the expiration of the existing franchise can be reasonably expected to contain these or other similar requirements.

While the FCC was expanding its regulation of cable television, the States began to examine whether they, too, should regulate the industry. Seven of the States which first elected to regulate cable television, beginning with Connecticut in 1963, adopted public utility type regulations that removed authority from the local franchising agencies. Four States, however, have adopted a 3-tiered approach under which the local franchising authority still selects the cable operator but the State imposes guidelines on how the selection will be made and directs how the franchise must be written. Superimposed on this is the entire FCC certification and regulation process which assures that the State and local governing bodies have written a franchise which follows the prescribed rules. The FCC required this on the theory that the advance of the industry into a broadband communications network has made it too complex to be regulated at the local level by authorities who lack sufficient expertise to deal with the problems that arise.

During the taxable years in issue and continuing thereafter, the legislature of the State of California considered a number of proposals for regulation of cable television as a public utility or common carrier through either a cable television commission or the Public Utilities Commission. Both the Communications Subcommittee of the House of Representatives and the Office of Telecommunications Policy have endorsed further State involvement in the regulation of cable television.

Common carrier status under State law would change the nature of the cable operator's business. It would divorce the operator from any control over programming and require him to provide a conduit on a nondiscriminating basis. The operator would have a guaranteed rate of return on his investment but would be restricted in his selection of investments. State common carrier regulation would render locally granted television franchises virtually obsolete as operative documents.

The local franchise ordinances and the franchises issued in recent years have become more and more complex. In attempting to insure that local subscribers obtain the best possible services, the franchising authorities have imposed greater burdens and restrictions on the operators. Model franchises have been prepared and distributed by numerous State and semipublic organizations, and they have significantly influenced the content of the currently issued franchises.

### 8. *Tax Treatment of Investments in Franchises*

For each of the 5 taxable years in issue, petitioner's subsidiaries, i.e., County, Western, Concord, State, and Monterey, claimed depreciation deductions under section 167(a) with respect to the subject cable franchises and licenses as follows:

FRANCHISES AND LICENSES

| Subsidiary | 1967 | 1968 | 1969 | 1970 | 1971 |
|---|---|---|---|---|---|
| County | $3,054 | $3,055 | $3,054 | $3,054 | $3,054 |
| Western | 707 | 1,374 | 1,374 | 1,374 | 1,374 |
| Concord | 1,515 | 2,093 | 2,154 | 2,154 | 2,154 |
| State | 0 | 0 | 70,870 | 94,494 | 98,382 |
| Monterey | 0 | 0 | 0 | 0 | 9,832 |
| | 5,276 | 6,522 | 77,452 | 101,076 | 114,796 |

Each franchise or license was depreciated on a straight-line basis over the term of the franchise remaining at the time of its acquisition by one of petitioner's subsidiaries.

For the taxable years 1968 through 1971, inclusive, Concord claimed depreciation deductions under section 167(a) with respect to the easement granted to it by Newhall, computed on a straight-line basis over the term of the license granted by the County of Contra Costa. For the taxable years 1970 and 1971, Western claimed depreciation deductions under section 167(a) with respect to the easement granted to it by the City of Brisbane, computed on a straight-line basis over the term of the franchise granted by the City of South San Francisco. These claimed deductions are as follows:

EASEMENTS

| Subsidiary | 1968 | 1969 | 1970 | 1971 |
|---|---|---|---|---|
| Concord | $2,262 | $2,133 | $2,133 | $2,133 |
| Western | 0 | 0 | 143 | 143 |
| | 2,262 | 2,133 | 2,276 | 2,276 |

Respondent disallowed all these deductions on the ground that the subject franchises, licenses, and easements have indeterminate useful lives. The parties have stipulated that if the license granted to Concord by the County of Contra Costa and the franchise granted to Western by the City of South San Francisco are the proper subjects of an allowance for depreciation, then the easements which they employ are also proper subjects of an allowance for depreciation. The parties have also stipulated that, in respect of any franchise, license, and easement which this Court finds to be the subject of an allowance for depreciation, the amount of depreciation claimed in respect thereof on petitioner's income tax returns for the taxable years in issue is correct.

## OPINION

Section 167(a)(1)[2] permits the deduction of a reasonable allowance for the amortization of intangible assets, such as the cable television franchises held by petitioner's subsidiaries. To qualify for such allowance, the taxpayer must show that the useful life of such an asset can be estimated with reasonable accuracy. No depreciation allowance is permitted if the asset's useful life is indefinite or unlimited. Sec. 1.167(a)–3, Income Tax Regs.;[3] *Toledo TV Cable Co.*, 55 T.C.

---

[2] SEC. 167. DEPRECIATION.

(a) GENERAL RULE.—There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—

(1) of property used in the trade or business, * * *

[3] Sec. 1.167(a)–3. Intangibles.

If an intangible asset is known from experience or other factors to be of use in the business or in the production of income for only a limited period, the length of which can be estimated with reasonable accuracy, such an intangible asset may be the subject of a depreciation allowance. Examples are patents and copyrights. An intangible asset, the useful life of which is not limited, is not subject to the allowance for depreciation. No allowance will be permitted merely because, in the unsupported opinion of the taxpayer, the intangible asset has a limited useful life. No deduction for depreciation is allowable with respect to goodwill. For rules with respect to organizational expenditures, see section 248 and the regulations thereunder. For rules with respect to trademark and trade name expenditures, see section 177 and the regulations thereunder.

1107, 1117 (1971), affd. per ·curiam 483 F.2d 1398 (9th Cir. 1973); *Gulf Television Corp.*, 52 T.C. 1038, 1056–1057 (1969).

Although a franchise may be granted for a specific term, as were the ones here in dispute, the prescribed expiration date of a franchise does not necessarily mark the end of its useful life. Renewals must be taken into account. A franchise's useful life may be of an indeterminate duration if its renewal for an indefinite period is "reasonably certain," *Birmingham News Co. v. Patterson,* 224 F.Supp. 670, 676 (N.D. Ala. 1963), affd. per curiam 345 F.2d 531 (5th Cir. 1965); *Gulf Television Corp., supra* at 1056–1057; *George W. Knipe,* 24 T.C.M. 668, 691, 34 P-H Memo. T.C. par. 65, 132 (1965), affd. per curiam sub nom. *Equitable Publishing Co. v. Commissioner,* 356 F.2d 514 (3d Cir. 1966). However, if its renewal is not "reasonably certain," the franchise's stated term will measure its useful life.[4]

Whether future renewals are reasonably certain is a question of fact. *Toledo TV Cable Co.,* 55 T.C. at 1117; *Westinghouse Broadcasting Co.,* 36 T.C. 912, 921 (1961), affd. 309 F.2d 279 (3d Cir. 1962), cert. denied 372 U.S. 935 (1963). This question must be answered in the light of all the facts known or reasonably anticipated at the time a taxpayer files his return for the taxable year in question. See, e.g., *Gerrit Van De Steeg,* 60 T.C. 17, 27 (1973), affd. per curiam 510 F.2d 961 (9th Cir. 1975); *Westinghouse Broadcasting Co.,* 36 T.C. at 921. The facts and opinions to be considered take a wide range.

In the instant case we are dealing with a period (1967–71) in which the CATV industry was growing at an explosive rate.[5]

---

[4] While this and some other courts, in stating the standard to be employed in deciding whether intangible assets have indeterminate useful lives, have used similar phrases, such as "altogether likely," *KWTX Broadcasting* Co., 31 T.C. 952, 961 (1959), affd. per curiam 272 F.2d 406 (5th Cir. 1959), and "reasonably probable," *Toledo TV Cable Co.,* 55 T.C. 1107, 1117 (1971), affd. per curiam 483 F.2d 1398 (9th Cir. 1973), each of which could have a somewhat different shade of meaning, the use of those phrases does not appear to reflect a difference in views as to the proper standard. Rather, they are merely a restatement of the requirement of the regulation (sec. 1.167(a)–3, Income Tax Regs.) that the useful life of the asset be subject to estimation with reasonable accuracy.

[5] In *United States v. Southwestern Cable Co.,* 392 U.S. 157, 162–163 (1968), the Supreme Court observed:

"The CATV industry has grown rapidly since the establishment of the first commercial system in 1950. In the late 1950's, some 50 new systems were established each year; by 1959, there were 550 'nationally known and identified' systems serving

Government regulations affecting the industry were going through profound changes. Technological advances were revolutionizing the type and nature of the services which franchise operators could provide. Taking all this evidence into account, we think petitioner has shown that respondent erred in his determination that the disputed franchises have indeterminate useful lives. We emphasize the following facts and circumstances.

First, during the years in issue, the responsibilities of the Federal, State, and local governments in the regulation of cable television were being studied and changed so extensively that petitioner did not know what Government requirements would have to be met as a condition to obtaining renewal franchises. As of the close of 1971, the last year in controversy, the franchises had substantial remaining terms, ranging from approximately 6 to 18 years. At the time the franchises were granted, CATV regulation was limited to the city-county level, and the local municipalities had exclusive authority to grant franchises. Since that time both the Federal and State governments have shown increasing interest in the regulation of the CATV industry.

During one of the years in issue (1968), the FCC was sustained by the United States Supreme Court in its assertion of regulatory authority over CATV operations. Those decisions (*United States v. Southwestern Cable Co.*, 392 U.S. 157 (1968), and *Fortnightly Corp. v. United Artists*, 392 U.S. 390 (1968)) have been followed by a tide of rules affecting CATV operations as well as the contents of and procedure for obtaining subsequently granted franchises. Any renewal licenses will almost certainly require a certificate from the FCC of compliance with its constantly changing regulations, and such a certificate can be obtained only by meeting the FCC franchise requirements summarized in our findings.

---

a total audience of 1,500,000 to 2,000,000 persons. It has been more recently estimated that 'new systems are being founded at the rate of more than one per day, and * * * subscribers * * * signed on at the rate of 15,000 per month.' By late 1965, it was reported that there were 1,847 operating CATV systems, that 758 others were franchised but not yet in operation, and that there were 938 applications for additional franchises. The statistical evidence is incomplete, but, as the Commission [FCC] has observed, 'whatever the estimate, CATV growth is clearly explosive in nature.' Second Report and Order, 2 F.C.C. 2d 725, 738, n. 15. [Fn. ref. omitted.]"

By 1971 the number of subscribers nationwide exceeded 5,500,000 and by 1975 the number had risen to over 9,800,000.

Common carrier regulation of the industry was recommended in 1968 by the FCC and the President's Task Force on Communications Policy and in 1974 by the report of the President's Cabinet Committee on Cable Communications. Common carrier status would greatly affect the CATV industry. Moreover, 11 States have adopted provisions for regulation of the industry,[6] and the State of California's legislature has considered a number of proposals for regulation of cable television as a public utility or common carrier. Adoption of such proposals would place the CATV industry under regulation by a utility commission or other State agency and, as stated in our findings, would profoundly affect the industry. Informed opinion indicates that when petitioner's subsidiaries' franchises expire, local municipalities will not control the contents of CATV franchises but that the various States and the FCC will dictate the terms on which any renewals will be granted.

Obtaining new franchises can hardly be found to be reasonably certain when neither the Government agencies to be satisfied nor the requirements to be met are known.

Second, in the instant case none of the franchises of petitioner's subsidiaries and none of the enabling ordinances under which the franchises were granted contain renewal options or any other renewal provisions.[7] None of the franchises has ever been renewed, and the franchising authorities have no practice or custom of granting renewals. See *Gerrit Van De Steeg*, 60 T.C. at 27; *Pasadena City Lines, Inc.*, 23 T.C. 34, 38-39 (1954). If petitioner's subsidiaries decide to attempt to continue their CATV operations, they will have to obtain new franchises which meet the FCC requirements, and this will require them to file applications with the franchising authorities in competition with other applicants. In substance, the franchises will be new ones rather than renewals. Competition for new franchises can be expected

---

[6] The Supreme Court noted in *United States v. Southwestern Cable Co.*, supra at 163 n. 15, that in 1965 only two States, Connecticut and Nevada, regulated CATV systems. According to testimony at the trial of the instant case, nine other States, i.e., Vermont, New York, New Jersey, Hawaii, Delaware, Rhode Island, Alaska, Minnesota, and Massachusetts, now have some form of regulation.

[7] The franchises involved in *Toledo TV Cable Co.*, 55 T.C. 1107 (1971), affd. per curiam 483 F.2d 1398 (9th Cir. 1973), on which respondent heavily relies, contained renewal options and were renewed during the years therein before the Court.

from local entrepreneurial groups, multiple system operators, and possibly the local municipalities themselves.[8] See *Miami Valley Broadcasting Corp. v. United States*, 499 F.2d 677, 685–686 (Ct. Cl. 1974).

Public hearings involving due process and full and open disclosure, in accordance with FCC requirements, will be held to consider the legal, financial, technical, and other qualifications of applicants. An objective evaluation of the several applications will then be made by the franchising authorities. Such hearings and evaluations would have little real meaning if it was "reasonably certain" all along that the new franchises would be awarded to petitioner's subsidiaries. That such hearings are not pro forma proceedings is demonstrated by San Mateo County's refusal in 1975 to renew the Crystal-Brite franchise. The absence of any renewal provisions in the existing franchises and any customary pattern of granting renewals, coupled with the competitive applications and public hearings procedures, strongly militates against a finding that the franchises have a useful life of indeterminate duration. *Pasadena City Lines, Inc., supra* at 38–39; see *Gerrit Van De Steeg*, 60 T.C. at 27.

Third, there is the distinct possibility that, in lieu of renewing the franchises of petitioner's subsidiaries, the local municipalities will undertake the operation of the systems. The only one of the disputed franchises that is not the initial franchise for the area it covers is the Carmel franchise, which was originally issued to Alarm Corp. During 1967 the City of Carmel continued to investigate the possibility of operating the system itself, but, after an extended study, granted a new franchise to Alarm Corp. on substantially different terms. The City of San Bruno in San Mateo County and the City of Portola in Plumas County in California own and operate cable television systems. In 1970 the City of Palo Alto in Santa Clara County, Calif., initiated a study of a municipally owned cable television system which was still in progress at the end of the tax years herein before the Court.[9] Municipal operation

---

[8] Concern over "unbridled, cutthroat competition for local franchises" was expressed in the Cable Television Report and Suggested Ordinance of the League of California Cities, published in 1972.

[9] Cable Television Report and Suggested Ordinance, League of California Cities, published in 1972, discusses the pros and cons of municipal ownership of cable

of the CATV systems would, of course, result in a termination of the franchises.

Finally, as suggested above, we are dealing with a period in which the CATV industry was in a state of flux due to technological developments, the competition to get into this dramatically growing industry, and the changing views on the part of the local, State, and Federal governments on how the industry should be regulated. See *Roy H. Park Broadcasting, Inc.,* 56 T.C. 784, 804 n. 8 (1971) (unstable market conditions); *Miami Valley Broadcasting Corp. v. United States,* 499 F.2d at 686 (local competition which would have required revised television network affiliations). Since none of the franchises held by petitioner's subsidiaries during the years in issue contained renewal options or other similar provisions and there was no pattern of renewals, petitioner's subsidiaries had no express or implied legal right to renewal franchises. And if renewal franchises are eventually negotiated by petitioner's subsidiaries, with either the local, State, or Federal government, the terms of those franchises will be vastly different in terms of rights, duties, obligations, types of services, and a host of other matters. See *Gerrit Van De Steeg,* 60 T.C. at 28.

Whether these factors are viewed as demonstrating that renewal of the franchises held by petitioner's subsidiaries was not "reasonably certain" or whether obtaining each such renewed franchise is to be viewed as creating new and substantially different rights and hence a new asset, *Curtis v. United States,* an unreported case (W.D. Wash. 1972, 29 AFTR

---

television systems, stating inter alia:

"Proponents argue that a municipally owned system is good for a city if 'properly controlled, guided and set up;' that the financial rewards and benefits of such an operation can be extended into the community in the form of additional services; that municipal ownership is good for the advancement of the cable television industry as a whole, particularly because, they argue, private operators are under current financial constraints inhibiting the additional expense of investment in two-way systems.

"As in the case of electric power and water supply, municipal ownership has also provided an invaluable 'yardstick' for other cities where such services are provided by private companies. Without the knowledge and experience in such municipal operation, other cities, and the League [League of California Cities], would be literally 'in the dark,' substantially handicapped in representing the public interest in these areas."

The report also states that, in 1971, the Attorney General confirmed that the California constitution provides sufficient authority to cities to own and operate a municipal cable television system. Also, the Attorney General has issued an opinion that a California city would be authorized to issue general obligation bonds to finance a cable television system.

2d 72–924, 72–1 USTC par. 9330); *Gerrit Van De Steeg*, 60 T.C. at 25,[10] we think they show the useful lives of the franchises in dispute were not of indefinite duration. To attempt to predict whether and on what terms petitioner's subsidiaries will be permitted to continue the operations they carry out under their current franchises, some of which do not expire until 1989 or 1990, is conjecture.

Respondent relies heavily upon *Toledo TV Cable Co.*, 55 T.C. 1107 (1971), affd. per curiam 483 F.2d 1398 (9th Cir. 1973), but the facts of that case are distinguishable. That case involved two purchased franchises, one for a term of 10 years with an option to renew for a similar term. At the time of the trial, that franchise had been renewed, and the new franchise contained a 10-year renewal option. The other franchise did not contain an option to renew but was renegotiated during the years therein before the Court. The new franchise contained an option to renew for 10 years. This Court emphasized these options as well as the actual renewals, and distinguished *Pasadena City Lines, Inc., supra*, on this ground. In contrast, as noted above, none of the franchises here in controversy contains renewal options, and none has been renewed.

Moreover, in the *Toledo TV Cable Co.* case, the Court found that the taxpayers reasonably anticipated that the franchises would be renewed because the purchase price of one of the franchises was arrived at on the basis of income projections over a period of 12 to 14 years even though the franchise had only approximately 7 years to run. The other franchise was scheduled to expire within less than 3 years after it was acquired. In the instant case the franchises acquired by petitioner's subsidiaries had approximately 9½ to 21 years to run, and the projected operating receipts from each franchise were sufficient to permit the acquiring subsidiary to recover

---

[10] See also *Westinghouse Broadcasting Co.*, 36 T.C. 912, 919 (1961), affd. 309 F.2d 279 (3d Cir. 1962), cert. denied 372 U.S. 935 (1963). In *Toledo TV Cable Co.*, 55 T.C. at 1123, the Court said:

"Had the petitioners been able to show that the new franchises differed materially from the originals, the showing would have had a dual effect. Firstly, a new franchise not sharing a substantial identity with the old may well be indicative of a new asset, leading to the conclusion that the old had a determinable useful life. Secondly, material differences would have the effect of reinforcing the petitioners' contentions that substantial renegotiations had occurred."

its investment over the remaining life of the franchise. Petitioner's corporate policy has forbidden each of its subsidiaries to enter into agreements or to borrow money for periods extending beyond the life of the franchise. Further, many of the technological developments and changes in governmental regulation of cable television, described in our findings, either occurred after the close of the taxable years there at issue (1963–66) or were not developed in the trial record. These and other facts demonstrate the differences between *Toledo TV Cable Co., supra,* and the instant case. The Court in that case described the issue as "a close factual question" (55 T.C. at 1117). We think the factual differences dictate the opposite finding here.

We conclude that the franchises held by petitioner's subsidiaries during the years in issue had limited useful lives, the duration of which was measured by their respective stated terms.

To reflect the disposition of other issues,

*Decision will be entered for the petitioner.*

---

[1] All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise noted.